McHENRY COUNTY, a Municipal Corporation, and Kiyus Albrecht, Gust Anderson, Jas. McCombs, Geo. Behner, J. E. Ellis, as Members of the Board of County Commissioners of McHenry County, a Municipal Corporation, and Meadow Township, a Municipal Corporation, and Geo. Freeman, J. E. Westford, F. T. Benson, Grimur Arheron, John Phillips, Ernest Goodman, Geo. Goodman, Riley Garrison, Bergur Magnusson, and John Svidal v. S. E. BRADY, Adam W. Gantz, Herbrand T. Lee, as Members of the Board of Drain Commissioners of McHenry County, North Dakota, and John H. Cook, of McHenry County, North Dakota, and John H. Cook, John H. Trimble, and W. R. Banks, as Members of the Board of Drain Commissioners of Bottineau County and S. E. Brady, Adam W. Gantz, Herbrand T. Lee, John H. Cook, John H. Trimble, and W. R. Banks, as Members of Bottineau and McHenry Counties, and France Dredging & Construction Company, a Corporation.

(163 N. W. 540.)

**Public interests — representatives of — litigation by private persons — public improvements — constructed and completed — private rights involved — public representatives cannot relitigate.**

1. The representatives of a public interest cannot stand idly by and allow the public interest to be litigated by private persons, and years after, and after the public improvements to be constructed have been practically completed, and private rights have become involved, seek to relitigate the matter.

**Judgment in former action — conclusive — upon questions determined — also upon all matters necessarily involved — parties — privies — those with common interest — subsequent litigation — same subject-matter — act invalid — assigning new reasons for so holding — not permitted.**

2. A judgment is conclusive, not only upon the questions actually contested and determined, but upon the matters which were necessarily involved in the suit; and parties, or their privies, or those with a common public interest, cannot afterwards, by assigning new reasons for holding an act invalid which existed at the time the prior decision was rendered, relitigate the question.

**Federal Constitution — state — treaty by — with other state — foreign power — Congress — consent of — political power — drain — consent to construction of — by neighboring state — or nation — surface waters — carrying away.**

3. The prohibitions of article 1 of § 10 of the Federal Constitution, which provide that "no state shall enter into any treaty, alliance, or confederation, . . . No state shall, without the consent of Congress, . . . enter into any agreement or compact with another state or with a foreign power," are directed against the formation of any combination tending to the increase of political power in the states which may encroach upon or interfere with the just supremacy of the United States. They are not directed against agreements which in no way encroach upon or weaken the general authority of Congress and which are in no way political, such as the obtaining of the consent of the authorities of the neighboring state or nation to the construction of a drain for the carrying away of surface waters which otherwise could be allowed to flow across the national boundary.

**Drain commissioners — of two counties — joint action by — province of Manitoba — license — agreement — treaty — Federal Constitution.**

4. The action of the joint boards or drain commissioners of the counties of McHenry and Bottineau in securing an outlet in the province of Manitoba for a drain constructed along the Mouse river for the purposes of draining lands in such counties, and constructed under the provisions of §§ 1821 and 1822 of the Revised Codes of 1905, as amended by chapter 93 of the Laws of 1907, Comp. Laws 1913, §§ 2464, 2465, and in obtaining a license from the municipality of Arthur, in said province, so to do, and in entering into an agreement to keep said drain open, is not in violation of the treaty between the United States and Canada known as treaty series No. 548 and ratified by the President of the United States April 1, 1910, and by Great Britain on March 31, 1910.

**Canada — North Dakota — laws of — riparian owners — upper — natural waterways — right to use — surface waters — lower riparian owners — cannot prevent.**

5. Under the laws of both Canada and North Dakota, the upper riparian owners have the right to make use of natural drain ways for the disposal of

their surface waters, and it is beyond the power of the lower riparian owners to prevent or obstruct the flow to the detriment of the upper or superior lands or territory.

Officers — acts of — de jure — attacked collaterally — cannot be.
  6. The acts of *de jure* officers cannot be collaterally attacked.

Opinion filed May 14, 1917.

Action to enjoin the further construction of a proposed drain, and to declare null and void all acts and doings in connection therewith and the levying of taxes and assessments therefor.

Appeal from the District Court of McHenry County, Honorable *Charles M. Cooley,* Special Judge.

Judgment for defendants. Plaintiffs appeal.

. Affirmed.

Statement of facts by BRUCE, Ch. J.

This is an action brought to restrain and enjoin the further construction or maintenance of a certain drain known as Mouse river drain No. 9, and that the acts and deed of defendants in connection with the establishment and construction of said drain, and the levying of taxes or assessment therefor, be restrained and enjoined and declared null and void, and for such other and further relief as may be just and equitable. Since, however, the drain has now been completed, the action is now merely one to enjoin its maintenance and the levying and collecting of. the taxes and assessments.

The facts have been stipulated in part and may be summarized in part as follows:

Mouse river enters the state of North Dakota in the eastern part of Ward county, and thereafter flows in a southeasterly course for about 65 miles from the international boundary line. It then changes its course to an easterly and thereafter gradually to a northerly and northwesterly direction until it reaches the international boundary line at a point about 40 miles east of its entrance into the state, and after having passed through McHenry and Bottineau counties since it left Ward county.

The purported object of the drainage project is to deepen and

widen the river bed through its course for about 30 miles south of the international boundary line, and for a distance of about 14 miles north thereof, through the channel of the river after it flows into Manitoba.

The respective drainage boards of McHenry and Bottineau counties were petitioned by the residents and landowners interested, to establish a drain in the channel of the river; the petitions thereof, however, limiting the course of such drain to the point where such river enters Manitoba in a northerly direction at the boundary line.

The state engineer of North Dakota was employed, and made an examination of the river and the land affected, reporting that such lands could be reclaimed and the water drained therefrom by deepening the channel of the river, and widening the same to eliminate sharp curves in its course.

The two boards made an examination of the proposed drain, and by resolution declared that the same was necessary for the public good. Afterward the two boards met at a joint drainage board, employed the state engineer to prepare plans, profiles, and plats of the land to be drained, and passed a resolution that the drain was necessary and for the public good.

The joint board fixed July 10, 1908, as the date when objections to the proposed drain would be heard; and on such date they made an order designating the commencement and course of the drain, and declaring the same to be for the public good and necessity.

The state engineer recommended that the terminus of the proposed drain be changed from the course indicated in the petitions and established by the respective drainage boards, by extending the same to the mouth of North Antler creek, where it empties into the Mouse river, 14 miles north of the boundary line in Canada, asserting the drain would be of no value or purpose unless such extension and improvement in Canada were carried out.

The total cost of the drain was estimated at $142,000, of which about $70,000 would be required to do the work in Canada, unless it be, as was testified to upon the trial of this action, a change of plans will reduce this expense $16,000 to $20,000. Of this amount only $36,000 was assessed against the petitioners.

The territory across the boundary line, through which the improve-

ment of the river is to be made, is in the rural municipality of Aruth, and under its governmental control. This municipality passed a by-law in reference to the improvement of the river by the joint drainage board, known as by-laws No. 372, enacted by the council of the municipality of Arthur, pursuane to the municipal act of the Dominion of Canada.

The by-law recites that certain lands in McHenry and Bottineau counties are covered by water to such an extent as to render the same unfit for use. It also recites that proceedings have been taken by the joint drainage board to improve the same. The course, commencement, and terminus of the proposed drain are recited, and it is further stated in the by-law that certain lands specifically described therein, and situated in the municipality of Arthur, would be beneficially affected by the construction of the drain. It also recites that a certain number of the owners of the land affected have petitioned Bottineau and McHenry counties to construct the drain, the expense thereof to be borne by such owners.

The by-law further provides that the drainage works and improvements in the river, within the municipality of Arthur, when completed, be controlled by such municipality.

It is further provided that the reeve and secretary-treasurer of the municipality be authorized to enter into a contract on behalf of such municipality, to secure the construction and completion of the drain, and its proper maintenance, pursuant to the provisions of such by-law.

Such a contract was made between the rural municipality of Arthur and the joint drainage board on February 24, 1909.

It recites the provisions of the by-law, and specifies that the municipality of Arthur, of the Dominion of Canada, permits the drainage commissioners to construct the drain, and make the improvements northward from the international boundary, in accordance with the plans prepared by the state engineer of North Dakota.

The contract further provides that the commissioners are bound to improve the river, and complete such improvements in a good and workmanlike manner, and to keep the same in repair, and that the commissioners are to assume and pay all taxes or losses which might accrue or arise in consequence of the construction of this improvement, and that the municipality of Arthur is to be at all times made harmless

on account of making such improvements or the maintenance thereof; and that all improvements, by reason of the construction of such drain in the river north of the international boundary line, is to be controlled by the municipality of Arthur, of the Dominion of Canada, and maintained by the commissioners of McHenry and Bottineau counties.

This contract, while it purports to bind the county commissioners of McHenry and Bottineau counties to maintain the drain, is, however, entered into only on behalf of the joint drainage board, and not on behalf of any other officer of the counties of McHenry and Bottineau, or of the state of North Dakota.

The joint drainage board has attempted to assess against the counties of McHenry and Bottineau, and the township of Meadow, and other townships, a considerable portion of the cost of the improvement, by way of special assessment, and to subject such counties and townships to the payment of their respective portions of such improvement out of the general fund of such municipalities.

In the year 1909 a treaty was negotiated between the United States and Great Britain, having for its object to prevent disputes regarding the use of boundary waters, and to settle all questions then pending between the United States and the Dominion of Canada, involving the rights, obligations, or interests of either in relation to the other, or to the inhabitants of the other along their common frontier, and to make provision for the adjustment and settlement of all such questions as might thereafter arise between the high contracting parties. The terms of this treaty will be considered at length in the argument.

The following points summarize the general grounds upon which the appellants rely in this action:

1. Control of the drain or that portion upon which the successful operation of the entire drain depends is reserved in the rural municipality of Arthur, contrary to the drainage laws of this state.

2. Title to the right of way of that portion of the drain upon which the successful operation of the entire project depends has not been acquired, but is still vested and in control of the rural municipality of Arthur, and other property owners, who are residents and citizens of a foreign power, not subject to the laws of this country as to eminent domain or any other laws or regulations of this state.

3. Benefits are conferred on lands in Canada which are not assessed for such benefits.

4. No power exists in drainage boards to secure an outlet or maintain a drain or any part thereof in territory of a foreign sovereign nation.

5. The attempted construction and maintenance of that portion lying north of the international boundary line in Canada upon which the successful operation of the entire drain depends, and the negotiations and contracts with the rural municipality of Arthur, which are the basis for such proceedings, constitute an unlawful attempt to invade the treaty-making power vested in the Federal government and render the same wholly void, as an attempt on the part of the state through its agent to enter into an agreement and compact with another state or foreign power without the consent of Congress.

6. The attempted construction and maintenance of that portion lying north of the international boundary line in Canada, upon which the successful operation of the entire drain depends, is an attempt to forcibly submit these plaintiffs and their lands and goods to the sovereignty and control of a foreign independent nation, and is in violation of the Constitution and fundamental law, and (a) denies to these plaintiffs equal protection of the law; (b) deprives them of liberty and property without due process of law; (c) imposes upon them and their property the sovereignty of a foreign independent power; and (d) abridges and destroys the privileges and immunities enjoyed by these plaintiffs as citizens of the United States.

7. The petition for the drain which is the basis of the drainage proceedings confines the north terminus of the drain to the north line of Bottineau county, and the extension and maintenance of such drain, north and beyond that point, for a distance of 15 miles into the territory of a foreign, independent nation, is without jurisdiction and void.

8. That since the 13th day of June, 1911, the defendants have had no lawful right or authority to act as a joint drainage board, and that said McHenry county has not been represented therein by any of its lawful representatives, and that all proceedings taken by the defendants since that period have been and are wholly void.

9. That the defendants S. E. Brady and Adam W. Gantsz not since

37 N. D.—5.

the 13th day of June, 1911, had any lawful right or authority to represent said McHenry county or said drainage board, or to do any act or suffer any omission with reference to said board in any way binding upon these plaintiffs, and that the purported contract made with the defendants France Dredging & Construction Company is illegal and void.

10. The defendants are seeking by unlawful acts and contracts to impose a heavy and unjust tax and burden upon these plaintiffs, which tax is imposed for benefits conferred upon citizens of a foreign, independent nation, and which taxes cannot be of equal and uniform operation, but the basis thereof are and must be unequal, illegal, and void in that moneys are expended out of taxing districts when assessed.

11. The alleged assessment of McHenry county and Meadow township for alleged benefits is without authority and void, and a new assessment of benefits must in any event be made as a basis for taxation.

*Lawrence & Murphy,* and *John Thorpe,* State's Attorney of McHenry County, for appellants.

*George R. Robbins* and *George A. Bangs,* for respondents.

BRUCE, Ch. J. (after stating the facts as above). The drainage proceedings involved in this controversy have already been before this court in the case of Freeman v. Trimble, 21 N. D. 1, 129 N. W. 83. It was there held that:

(1) The joint boards of drain commissioners have power to secure an outlet to drains established within their district, in foreign territory, where a public necessity exists for securing such outlets.

(2) Where it is necessary to improve, deepen, or widen the channel or bed of a river in this state in order to drain flooded lands, and the deepening and widening of such river in this state would not be effectual in draining such lands, without deepening and widening the river bed for about 12 or 14 miles after it passes into Canada, the drain commissioners have power to secure a suitable outlet by improving the river after it passes into Canada.

(3) In such a case, the fact that the control of the improvement after its completion is not vested in the county commissioners, but in the council of the municipality through which the river passes, in

Canada, by virtue of a by-law of said municipality and a contract between it and the board of drain commissioners, does not defeat the right of the drain commissioners to secure such outlet by improving the river bed.

(4) Section 1823, Rev. Codes 1905 as amended in 1907, Comp. Laws 1913, § 2466, making it necessary to secure the right of way to land through which drains in this state pass, has no application to improvement of water courses for drainage purposes.

(5) Improving a water course after it passes beyond the drainage district for 12 to 14 miles into foreign territory, for the purpose of making an improvement of the water course in this state efficacious, is not an unreasonable exercise of the power of securing an outlet for drain purposes.

(6) The general principle that land benefited by a drain equally with other land, that is assessed for such benefits, shall not be arbitrarily omitted from such assessment, is not applicable where land in foreign territory is not, and cannot be, assessed for benefits incident to the construction of the drain in the drainage district that is assessed.

These findings practically dispose of all of the contentions of the appellants in this case except the contention that the attempted construction and maintenance of that portion of the drain which lies in Canada, and the negotiations and contracts with the rural municipality of Arthur, constitute an unlawful attempt to invade the treaty-making power, which is vested in the Federal government.

It is argued, indeed, by counsel for respondent that the prior decision makes all of these matters *res judicata*. Counsel for the appellant, however, contends that the parties plaintiff are different. An examination shows that all of the individual plaintiffs in the present action were plaintiffs in the former case, and that the only additions are McHenry county and its board of county commissioners and Meadow township. It is also shown that McHenry county contributed $300 to award the payment of expenses of the former litigation, and that both McHenry county and Meadow township were in existence when the former litigation was instituted. The defendants in the present litigation are the same as those in the former controversy. The relief prayed for in the former action was that the defendants be enjoined from letting contracts for the construction of the drain, and from taking

any further steps for the establishment or construction of such drain, and for other equitable relief. The relief prayed for in the present case is that the defendants be enjoined from proceeding any further with the construction of the drain, and that their acts in establishing and constructing the same and the levying of taxes be declared void, and for other equitable relief.

Whether the former decision constitutes *res judicata,* it is not necessary for us to say. All that is necessary to say is that the former decision certainly presents the law of the case, and that this court after such a decision, which was rendered after a full presentation and after a rehearing, will not, after the drain has been constructed, the expense incurred, and the benefits conferred, reverse its prior holdings.

The only possible defense which remains and which was not specifically passed upon in the case is that the transaction is an encroachment upon the Federal treaty-making power and a violation of the Federal constitutional provision which forbids agreements or compacts between a state and a foreign power without the consent of Congress. And this question can only be raised, if at all, by the plaintiffs McHenry county and Meadow township, as the point was certainly involved in the prior litigation. It is true it was not raised or discussed by counsel on either side, and was only incidentally raised in the dissenting opinion of Mr. Justice Spalding, but it was involved nevertheless and would ordinarily be considered to be foreclosed at this time. See Re Northwestern University, 206 Ill. 64, 69 N. E. 75; Greenberg v. Chicago, 256 Ill. 213, 49 L.R.A.(N.S.) 108, 99 N. E. 1039.

It is apparent, indeed, that the new plaintiffs merely acted in a representative capacity and as representatives of the public interests of the citizens of their county and municipality. Such representatives are privy to any other action in which the same interest is brought in question, even though not by same parties thereto. State ex rel. Davis v. Willis, 19 N. D. 209–225, 124 N. W. 706; Freeman, Judgm. § 158; Sabin v. Sherman, 28 Kan. 289; Dimond v. Ely, 28 N. D. 426, 149 N. W. 349; Greenberg v. Chicago, supra; 23 Cyc. 1269.

Nor do we believe that the fact that the treaty relied upon was not urged in the former proceedings, and was only suggested in the

dissenting opinion of Mr. Justice Spalding, in any way changes the situation.

The general rule, indeed, seems to be that a judgment is conclusive, not only upon the questions actually contested and determined, but upon all matters directly involved and which might have been litigated and decided in that suit, and that of assigning new reasons for holding an act invalid which existed at the time the prior decision was rendered, the parties cannot relitigate the question settled by that litigation.

The plaintiffs, indeed, if with any standing in court at all, come here with every equity against them. They must have known of the former proceeding, for they contributed towards its expenses, and yet they stood idly by and allowed it to be brought in the names of others. They have now practically all of the benefits of the drain, and yet they desire to escape its cost. They are the owners of, or are interested in, the upper lands. These lands have been drained into the lower lands of Bottineau county to be thence directed across the border. Now that the drain is completed and bonds have been issued, their surface waters are disposed of, and, unless a proper outlet is had, the lands of Bottineau county will themselves be flooded, they seek to block the project, and to raise questions of which they must have been, or should have been, cognizant at the time of the original action. Hackney v. Elliott, 23 N. D. 373, 398, 137 N. W. 433; Erickson v. Cass County, 11 N. D. 494, 508, 92 N. W. 841.

But whether precluded or not, we do not believe that there is any merit in the objections raised.

The question is whether the proceedings in consideration were in violation of the following section of the Federal Constitution, article 1 of § 10:

"No state shall enter into any treaty, alliance, or confederation. . . .

"No state shall, without the consent of Congress, . . . enter into any agreement or compact with another state or with a foreign power."

The argument of counsel for appellant is that if the engagement of the drainage board with the municipality of Arthur is a treaty or an invasion of the treaty-making power, it is void, whether undertaken with or without the consent of Congress. If it is an agreement or

compact with another state, or foreign power, it is void unless Congress has by a general law or specific statute authorized the same. He does not, however, seriously contend that it is a treaty. He argues that it is a compact or agreement. He argues that one contracting party is a public board acting pursuant to a specific grant of power from the state of North Dakota; that it acts as a public body; that its members are appointed by the governing body of their respective counties; and that the members of this governing body take an oath of office to support and defend the Constitution of the United States and of the state of North Dakota; that their compensation is paid from the public revenues; and that such members are subject to removal for cause by the governor of the state of North Dakota.

Moreover, he adds: "When this agency of government undertakes to exercise the functions prescribed by law, it keeps a public record of its meetings, it purports to execute contracts and engagements binding upon the citizens of the state thereby affected, or citizens of other states owning property therein, and so long as it exercises its functions within the scope of its statutory authority, it may and does impose heavy burdens upon the property of the citizens by virtue of its public authority; and as defendants assert in this case, it enjoys the additional power of imposing such burdens under legal authority upon the counties of the state and other governmental subdivisions, which burdens in the case of the counties of McHenry and Bottineau, if legally assessed and imposed, are payable as a debt of such counties out of the general revenues raised by taxation of all citizens and property owners within such counties."

He also maintains that the municipality of Arthur in the Dominion of Canada occupies the same relationship to the parent state.

We do not believe that there was any violation of § 10 of article 1 of the Federal Constitution, which provides that "no state shall enter into any treaty, alliance, or confederation. . . . No state shall, without the consent of Congress, . . . enter into any agreement or compact with another state or with a foreign power." It is true that the case of Holmes v. Jennisen, 14 Pet. 540, 10 L. ed. 579, uses quite sweeping language in regard to the clause in question. The case, however, was one which involved the right of extradition, which is essentially a national and governmental power, and its language must

be construed in connection with the subject under consideration. Although, indeed, there is language in that case which seems to preclude any intercourse between a state and a foreign state, the later decisions of the court seem to adopt the theory that not all intercourse is forbidden, or contracts prohibited, but only those agreements or compacts which affect the supremacy of the United States, or its political rights, or which tend in any measure to increase the political power of the states as against the United States or between themselves.

In the case of Virginia v. Tennessee, 148 U. S. 503, 37 L. ed. 537, 13 Sup. Ct. Rep. 728, the Supreme Court of the United States held that an agreement made without the consent of Congress, between Virginia and Tennessee, to appoint commissioners to run and mark the boundary line between the states, was not in violation of the Federal rights. Among other things, the court through Mr. Justice Field said:

"Is the agreement made without the consent of Congress, between Virginia and Tennessee, to appoint commissioners to run and mark the boundary line between them, within the prohibition of this clause? The terms 'agreement' or 'compact' taken by themselves are sufficiently comprehensive to embrace all forms of stipulation, written or verbal, and relating to all kinds of subjects; to those to which the United States can have no possible objection or have any interest in interfering with, as well as to those which may tend to increase and build up the political influence of the contracting states, so as to encroach upon or impair the supremacy of the United States or interfere with their rightful management of particular subjects placed under their entire control.

"There are many matters upon which different states may agree that can in no respect concern the United States. If, for instance, Virginia should come into possession and ownership of a small parcel of land in New York which the latter state might desire to acquire as a site for a public building, it would hardly be deemed essential for the latter state to obtain the consent of Congress before it could make a valid agreement with Virginia for· the purchase of the land. If Massachusetts, in forwarding its exhibits to the World's Fair at Chicago, should desire to transport them a part of the distance over the Erie canal, it would hardly be deemed essential for that state to obtain the consent of Congress before it could contract with New York

for the transportation of the exhibits through that state in that way. If the bordering line of two states should cross some malarious and disease-producing district, there could be no possible reason, on any conceivable public grounds, to obtain the consent of Congress for the bordering states to agree to unite in draining the district, and thus removing the cause of disease. So, in case of threatened invasion of cholera, plague, or other causes of sickness and death, it would be the height of absurdity to hold that the threatened states could not unite in providing means to prevent and repel the invasion of the pestilence without obtaining the consent of Congress, which might not be at the time in session. *If, then, the terms 'compact' or 'agreement' in the Constitution do not apply to every possible compact or agreement between one state and another,* for the validity of which the consent of Congress must be obtained, to what compacts or agreements does the Constitution apply?

"We can only reply by looking at the object of the constitutional provision and construing the terms 'agreements' and 'compact' by reference to it. It is a familiar rule in the construction of terms to apply to them the meaning naturally attaching to them from their context. *Noscitur a sociis* is a rule of construction applicable to all written instruments. Where any particular word is obscure or of doubtful meaning, taken by itself, its obscurity or doubt may be removed by reference to associated words. And the meaning of a term may be enlarged or restrained by reference to the object of the whole clause in which it is used.

"Looking at the clause in which the terms 'compact' or 'agreement' appear, it is evident that the prohibition is directed to the formation of *any combination tending to the increase of political power in the states, which may encroach upon or interfere with the just supremacy of the United States.* Story, in his Commentaries (§ 1403) referring to a previous part of the same section of the Constitution in which the clause in question appears, observes that its language 'may be more plausibly interpreted from the terms used, "treaty, alliance, or confederation," and upon the ground that the sense of each is best known by its association (*noscitur a sociis*) to apply to treaties of a political character; such as treaties of alliance for purposes of peace and war; and treaties of confederation, in which the parties are leagued for

mutual government, political co-operation, and the exercise of political sovereignty, and treaties of cession of sovereignty, or conferring internal political jurisdiction, or external political dependence, or general commercial privileges;' and that 'the latter clause, "compacts and agreements," might then very properly apply to such as regarded what might be deemed mere private rights of sovereignty; such as questions of boundary; interests in land situate in the territory of each other; and other internal regulations for the mutual comfort and convenience of states bordering on each' other.' And he adds: 'In such cases the consent of Congress may be properly required, in order to check any infringement of the rights of the national government; and, at the same time, a total prohibition to enter into any compact or agreement might be attended with permanent inconvenience or public mischief.'

"Compacts or agreements—and we do not perceive any difference in the meaning, except that the word 'compact' is generally used with reference to more formal and serious engagements than is usually implied in the term 'agreement'—cover all stipulations affecting the conduct or claims of the parties. The mere selection of parties to run and designate the boundary line between two states, or to designate what line should be run, of itself imports no agreement to accept the line run by them, and such action of itself does not come within the prohibition. Nor does a legislative declaration, following such line, that it is correct, and shall thereafter be deemed the true and established line, import by itself a contract or agreement with the adjoining state. It is a legislative declaration which the state and individuals affected by the recognized boundary line may invoke against the state as an admission, but not as a compact or agreement. The legislative declaration will take the form of an agreement or compact when it recites some consideration for it from the other party affected by it; for example, as made upon a similar declaration of the border or contracting state. The mutual declarations may then be reasonably treated as made upon mutual considerations. The compact or agreement will then be within the prohibition of the Constitution or without it, according as the establishment of the boundary line may lead or not to the increase of the political power or influence of the states affected, and thus encroach or not upon the full and free exercise of Federal authority. If the boundary established is so run as to cut off an important and valuable

portion of a state, the political power of the state enlarged would be affected by the settlement of the boundary; and to an agreement for the running of such a boundary or rather for its adoption afterwards, the consent of Congress may well be required. But the running of a boundary may have no effect upon the political influence of either state; it may simply serve to mark and define that which actually existed before, but was undefined and unmarked. In that case the agreement for the running of the line, or its actual survey, would in no respect displace the relation of either of the states to the general government. There was, therefore, no compact or agreement between the states in this case which required, for its validity, the consent of Congress, within the meaning of the Constitution, until they had passed upon the report of the commissioners, ratified their action, and mutually declared the boundary established by them to be the true and real boundary between the states. Such ratification was mutually made by each state in consideration of the ratification of the other."

This language was quoted with approval in the case of Wharton v. Wise, 153 U. S. 155–168, 38 L. ed. 669–674, 14 Sup. Ct. Rep. 787. In that case the validity of a compact between the states of Virginia and Maryland, which gave to the citizens of Maryland the right to enjoy freely the right to take oysters in common with the citizens of Virginia in Pocomoke Sound, was passed upon by the court.

In addition to quoting the language in the case of Wharton v. Wise, the court said:

"So, in the present case, looking at the object evidently intended by the prohibition of the Articles of Confederation, we are clear they were not directed against agreements of the character expressed by the compact under consideration. Its execution could in no respect encroach upon or weaken the general authority of Congress under those articles. Various compacts were entered into between Pennsylvania and New Jersey and between Pennsylvania and Virginia, during the Confederation, in reference to boundaries between them, and to rights of fishery in their waters, and to titles to land in their respective states, without the consent of Congress, which indicated that such consent was not deemed essential to their validity. Virginia and Maryland were sovereign states, with no common superior and no tribunal to determine for them the true construction and meaning of its provisions in case of

a conflict of opinion upon the subject. Each state was left to decide for itself as to their true construction and meaning, and to its own sense of the obligations of the compact for their enforcement. If, therefore, the Congress of the United States, which, as said above, never complained of the compact of 1785, had interposed objections to its adoption or enforcement as being within the meaning of the terms 'treaty' or 'confederation,' or as establishing an alliance within the prohibition of the articles mentioned, yet it would not lie in either of the states that were parties to the contract to allege its invalidiy on the subject. As said by Mr. Steele, in his very able and elaborate opinion, upon the construction of provisions of the compact, given to the governor of Maryland, and which is referred to in the record, they cannot complain that there was in its adoption any breach of good faith towards themselves, and we may add, or any rupture by them of the league of friendship declared to be the object of the articles to establish.

"In our judgment the compact of 1785 was not prohibited by the Articles of Confederation. It was not a treaty, confederation, or alliance within the meaning of those terms as there used, and it remained as a subsisting operative contract between them in full force when the Confederation went out of existence upon the adoption of the present Constitution of the United States. And it was not affected or set aside by the prohibitory clause of that instrument. Its prohibition extends only to future agreements or compacts, not against those already in existence, except so far as their stipulations might affect subjects placed under the control of Congress, such as commerce and the navigation of public waters, which is included under the power to regulate commerce."

The same language was again quoted with approval in Stearns v. Minnesota, 179 U. S. 223, 45 L. ed. 162, 21 Sup. Ct. Rep. 73, and again in Louisiana v. Texas, 176 U. S. 1, 44 L. ed. 347, 20 Sup. Ct. Rep. 251.

In the case of Fisher v. Steele, 39 La. Ann. 447, 1 So. 888, the validity of an appropriation made by the Louisiana legislature for the construction of levees in Arkansas and along the Mississippi river north of Louisiana was involved. This case is very similar to the one at bar, as it was to prevent the flooding of lands in Louisiana, just the same as the improvement in question was to prevent the flooding of lands in North Dakota. A compact between two states was involved, as the

levees were only to be built after an agreement or consent of the state of Arkansas. In its opinion the Louisiana court said:

"The seventh objection invokes the 2d paragraph of § 10 of article 1 of the Constitution of the United States, which reads: 'No state shall, without the consent of Congress, . . . enter into any agreement or compact with another state or with a foreign power, or engage in war unless actually invaded, or in such imminent danger as will not admit delay.' "

"On reading that objection in connection with the constitutional prohibition just quoted, the mind would naturally expect a charge that the state of Louisiana was projecting a treaty of alliance with the state of Arkansas, or contemplating some joint scheme of commercial or industrial enterprise, or perhaps conspiring for the establishment of a new confederacy; but great is the relief when the mind is informed that the purpose which the plaintiff resists with such a powerful shield is merely to build a piece of levee in the state of Arkansas, if necessary, and if that state does not object, or consents. It is, indeed, too clear for argument that such a transaction is no more a prohibited compact between two states than is contained in the requisition of our governor for, and the consent of another to, the capture and arrest of a fugitive from justice."

Again, and as early as 1853, and in the case of Union Branch R. Co. v. East Tennessee & G. R. Co. 14 Ga. 327, the Georgia court upheld the right of the state to authorize a foreign railroad to construct a bridge across the boundary line, with the consent and agreement of the two states. In its opinion, the court said: "This prohibition applies only to such an 'agreement or compact' as is in its nature political; . . . the framers of the Constitution clearly intended nothing more . . . than to prohibit the several states from exercising their authority in any way which might limit or infringe upon a full and complete execution by the general government of the powers intended to be delegated by the Federal Constitution."

See also Dover v. Portsmouth Bridge, 17 N. H. 200.

In the Barron Case, 7 Pet. 243–248, 8 L. ed. 672–674, Mr. Chief Justice Marshall said:

"The question thus presented is, we think, of great importance, but not of much difficulty. The Constitution was ordained and estab-

lished by the people of the United States for themselves, for their own government, and not for the government of the individual states. Each state established a Constitution for itself, and in that Constitution provided such limitations and restrictions on the powers of its particular government as its judgment dictated. The people of the United States framed such a government for the United States as they supposed best adapted to their situation and best calculated to promote their interests. The powers they conferred·on this government were to be exercised by itself; and the limitations on power, if expressed in general terms, are naturally, and, we think, necessarily, applicable to the government created by the instrument. There are limitations of power granted in the instrument itself; not of distinct governments, framed by different persons and for different purposes. . . . The 9th section having enumerated, in the nature of a bill of rights, the limitations intended to be imposed on the powers of the general government, the 10th proceeds to enumerate those which were to operate on the state legislatures. These restrictions are brought together in the same section, and are by express words applied to the states. 'No state shall enter into any treaty,' etc. Perceiving, that in a Constitution framed by the people of the United States, for the government of all, no limitation of the action of government on the people would apply to the state government, unless expressed in terms, the restrictions contained in the 10th section are in direct words so applied to the states.

"It is worthy of remark, too, that these inhibitions generally restrain state legislation on subjects intrusted to the general government, or in which the people of all the states feel an interest. A state is forbidden to enter into any treaty, alliance, or confederation. If these compacts are with foreign nations, they interfere with the treaty-making power, which is conferred entirely upon the general government; if with each other, for political purposes, they can scarcely fail to interfere with the general purpose and intent of the Constitution. To grant letters of marque and reprisal would lead directly to war; the power of declaring which is expressly given to Congress. To coin money is also the exercise of a power conferred on Congress. It would be tedious to recapitulate the several limitations on the powers of the states which are contained in this section. They will be found, generally, to restrain state legislation on subjects intrusted to the govern-

ment of the Union, in which the citizens of all the states are interested. In these alone were the whole people concerned. The question of their application to states is not left to construction. It is averred in positive words."

It is true these words were largely *dicta,* but they are illuminating nonetheless. See also Mackay v. New York, N. H. & H. R. Co. 82 Conn. 73, 24 L.R.A. (N.S.) 768, 72 Atl. 587; Searsburg v. Woodford, 76 Vt. 370, 57 Atl. 961.

The rule is summed up in 36 Cyc. 838, as follows: "This provision, however, does not apply to every possible agreement or compact between two states, *but only to such as might tend to increase the political power of the states affected,* and thus encroach upon or interfere with the supremacy of the United States; agreements which can in no respect concern the United States may be made by the states without the consent of Congress. The consent of Congress to an agreement between states may be given after as well as before the making of the agreement, and need not be expressed in any particular form; it is sufficient that Congress, by some positive act in relation to the agreement, has signified its consent thereto."

The same considerations apply when we come to consider appellants' point, that the attempted construction and maintenance of the portion of the drain which lies north of the international boundary line is an attempt to forcibly submit the plaintiffs and their lands to the sovereignty and control of a foreign independent nation, and to deprive them of liberty and property without due process of law and the equal protection of the laws, and to abridge and destroy the privileges and immunities of citizens of the United States. How the purchase or the agreement for the construction of a right of way or drain in Canada, which is necessary for an outlet to a drainage system in the United States, subjects any person to the control of a foreign nation, it is difficult for us to see. This is not a case of constructing a drain in Canada with an outlet in the United States, but of constructing a drain in the United States with an outlet in Canada; the outlet merely being the incident. It is no different than the purchase of a piece of land by the state of Virginia in the state of New York, which the former state might desire to acquire as a site for a public building, or for the purchase of a building in Illinois for the purpose of exhibiting

at a World's Fair, which is spoken of by Mr. Justice Field in Virginia v. Tennessee, 148 U. S. 503, 37 L. ed. 537, 13 Sup. Ct. Rep. 728.

Nor, too, do we believe there is any merit in the contention that the defendants had any authority to stipulate to pay damages or losses which might occur to the Canadian municipality on account of the drain. Whether this agreement could be enforced or not, is a matter which we do not care to pass upon. The municipality of Arthur does not seem to have repudiated the contract, and no demand for any such losses has yet been made, and we do not believe that the contract can be collaterally attacked.

Nor do we believe that the agreement was in any way in conflict with the treaty between the United States and Canada, known as treaty series No. 548, ratified by the President of the United States, April 1, 1910, and by Great Britain on March 31, 1910.

The preamble of this act limits it (1) to disputes regarding the use of boundary waters; (2) the settlement of all questions which are now pending between the United States and Canada involving the rights, obligations, or interests of either in relation to the other or to the inhabitants of the other along their common frontier; (3) to make provision for the adjustment and settlement of all such questions as may hereafter arise. This preamble in no way covers the situation which is before us. There has been no dispute,—there has merely been a request for a license. Neither do we find, from the body of the act, any provisions which seem to deprive the local municipalities of the powers exercised in the case before us. The only provisions cited by counsel are the following:

"Article III. It is agreed that, in addition to the uses, obstructions, and diversions heretofore permitted or hereafter provided for by special agreement between the parties hereto, no further or other uses or obstructions or diversions, whether temporary or permanent, of boundary waters on either side of the line, affecting the natural level or flow of boundary waters on the other side of the line, shall be made except by authority of the United States or the Dominion of Canada within their respective jurisdictions, and with the approval, as hereinafter provided, of a joint commission, to be known as the International Joint Commission."

"Article IV. The High Contracting Parties agree that, except in

cases provided for by special agreement between them, they will not permit the construction or maintenance on their respective sides of the boundary of any remedial or protective works or any dams or other obstructions in waters flowing from boundary waters or in waters at a lower level than the boundary in rivers flowing across the boundary, the effect of which is to raise the natural level of waters on the other side of the boundary unless the construction or maintenance thereof is approved by the aforesaid International Joint Commission.

"It is further agreed that the waters herein defined as boundary waters and waters flowing across the boundary shall not be polluted on either side to the injury of health or property on the other."

"Article VIII. —The International Joint Commission shall have jurisdiction over and shall pass upon all cases involving the use or obstruction or diversion of the waters with respect to which under articles III. and IV. of this treaty the approval of this Commission is required. . . .

"In cases involving the elevation of the natural level of waters on either side of the line, as a result of the construction or maintenance on the other side of remedial or protective works or dams or other obstructions in boundary waters or in waters flowing therefrom or in waters below the boundary in rivers flowing across the boundary, the Commission shall require, as a condition of its approval thereof, that suitable and adequate provision, approved by it, be made for the protection and indemnity of all interests on the other side of the line which may be injured thereby." [36 Stat. at L. 2449–2452.]

It is clear that these provisions do not apply. There is here before us no question of artificial dams or of the artificial raising of waters. The waters are not boundary waters. All we have before us is a case where the drainage commissioners are seeking to dispose of the surface waters of their district. The Mouse or Souris river is a natural drain way, even though not a navigable river. Under the laws of both Canada and of North Dakota the upper riparian owners have the right to make use of it as a drain way, and it is beyond the power of the lower riparian owners to prevent or obstruct the flow to the detriment of the upper or superior lands or territory. See Soules v. Northern P. R. Co. 34 N. D. 7, L.R.A.1917A, 501, 157 N. W. 823. If the commissioners had stopped their work at the border, we hardly believe

that any of the residents of Canada or any of its municipalities would have had any ground for complaint, even though the flooding of their land would have been the result. An agreement or license by which that flooding is prevented can, therefore, hardly be said to be an interference with any treaty rights which relate merely to obstructions in the boundary waters.

There is no merit in the contention that the defendants S. E. Brady and Adam W. Ganstz, not since the 13th day of June, 1911, had any lawful right or authority to represent said McHenry county or said drainage board, or to do any act or suffer any omission with reference to said board, and that the purported contract made with the defendants France Dredging & Construction Company, is illegal and void. The officers in question were at least *de jure* officers, and it is quite clear that their acts cannot be here attacked. Page & Jones, Taxation by Assessment, § 1009; 2 High, Inj. 4th ed. 1312–1335; Graeff v. Felix, 200 Pa. 137, 49 Atl. 758.

The judgment of the District Court is affirmed.

CHRISTIANSON, J., being disqualified did not participate.

ROBINSON, J. (dissenting specially). In this case several years ago the drainage commissioners of Bottineau and McHenry counties undertook as a drainage project to deepen, widen, and straighten the channel of the Mouse river in the said counties and for 15 miles into Canada. In so doing they acted under the statute for the construction of drains, and all their doings must be governed by that statute in just the same manner as though there were no stream called Mouse river. The total cost of the drain as estimated was $142,000, of which $70,000 was for improvements in Canada. This suit is a second edition of an appeal from Judge Templeton in which the weight of judicial authority was about equally divided. 21 N. D. 1, 129 N. W. 83. The suit is to restrain further proceedings for the construction of the drain, and that all doings of the commissioners be adjudged null and void. The majority of the judges denied the relief, and the result must be a multitude of suits,—a suit by each person to abate and cancel any assessment that may be laid against his land for any sum in excess of special benefits. With so large an expenditure in Canada charged

37 N. D.—6.

against the land on this side of the line, it is but fair to presume that nearly all the special assessments are or will be for an excessive amount. When a special assessment against land is materially in excess of benefits, the landowner is in no way compensated for the excess, by the good faith or bad faith or the mental capacity of the parties making the assessment.   The law has no means of measuring their mental status. Good motives do not justify the confiscation of property by means of a special assessment.

The owner of land benefited by a drain must contribute his *pro rata* share to the expense of the drain to this extent that it contributes to the value of his land.   That is the limit of his liability.   The drain commissioners are bound to know the simple rule of law, and to levy no assessment against property in excess of actual benefits to the same.   Drain commissioners are not judicial officers.   They act under a statutory power and must keep within the limits of their power.   When an assessment is materially in excess of benefits, it is a fraud on the law and a usurpation of power which the courts must correct.

Of course the drainage commissioners had no power to make any special assessment against the lands in Canada, and they did not attempt to do it.   The moment they stepped across the boundary line they ceased to have any official authority to contract or to do anything whatever.   Then every act done by them was that of a volunteer private party.   And yet for the drainage improvements made, or to be made in Canada, the commissioners have assessed the total expense against the land and municipalities on the south side of the line, and in that way every assessment has been made for an excessive amount. The excess depends mainly on the sum which was added to defray the improvements made in Canada, including the surveys, the commissioners' charges, and everything thereto appertaining, and there may be other excessive charges.

It is needless to spin out a long decision on questions of estoppel, *res judicata,* and the power of a state to make treaties with other states. In any view that may be justly taken of this case, the special assessments which have been made are all excessive and void.   It is said that during the pendency of this action the drainage boards have gone on and completed the drainage project, and that Bottineau county has

issued a large amount of drainage bonds, and that a large amount of special assessments have been paid from year to year by landowners and by townships and by Bottineau county, and that in McHenry county the special assessments have not been extended against the lands or the municipalities. But all that is immaterial under the stated law which governs this case. Drainage bonds are not negotiable, and the purchasers take them at their own risk, and when a party has once paid on his void special assessment he must have a proper credit in case of a valid reassessment. Regardless of the legal defects in a drainage proceeding, every person benefited is bound to contribute his *pro rata* share to the sum total of the legal expense, but a special assessment must never exceed the special benefits. And that is true even though the sum total of the expense be swollen to twice the amount of the special benefits. There is much reason for claiming that the drainage statute is void in so far as it permits a board of men to sum up and allow all the costs and expenses incurred in the making of a drain, without notice to any party. The cost does commonly include a large sum for themselves, their attorneys, and other matter in which they have a personal interest. And under the statute the board fixes the total amount, and then makes a list assessing a specific amount against each municipality, lot, or tract of land benefited by the drain. Then the list is filed in the office of the county auditor, and he extends the several amounts on the general tax list as a special tax against each tract of land and municipality, which special tax is collected and enforced in the same manner as other taxes. Comp. Laws 1913, § 2474. Thus, without notice, judgment is given and execution is issued for the sum of the special assessment. Certain it is that such a statute cannot be sustained without holding that any landowner may go into court and show that a special assessment against his property is excessive and unjust.

The right to a preliminary contest on the mere percentage of benefits is no protection. It is only a contest on the percentage of cost and plunder that may be charged and extended as a tax against each tract of land. It in no manner affects the total amount, and that is by far the most important matter.

In so far as the Erickson Case, 11 N. D. 494, 92 N. W. 841, holds

to the contrary, it has no support in reason or in the cases cited to sustain it.

In this case it is clear that, without any legal notice to the parties interested, the sum total of the expense of the drain was computed and allowed by the commissioners, and extended, in whole or in part, against the lands and municipalities, and it was grossly excessive. Hence, it should all be set aside and declared and adjudged to be void.

Then on a proper notice and hearing, a personal notice by mail or otherwise, to every party interested, the board of commissioners might compute the total necessary expense of the drainage proceedings in McHenry county and in Bottineau county, and apportion and extend the same against the several tracts of land and municipalities. But regardless of the total expense, the sum extended and charged against any tract of land or municipality must not exceed the special benefits to the same.

In this case there is no use of talking of *res judicata* or the force of any prior decision binding on this court. Though it is the custom of courts to adhere to their own blunders and pile error upon error, the nefarious custom is not a law, and the custom is of less force when a party invokes a prior decision made by a bare majority of one judge, or by three judges voting against three judges, including the trial judge.

It is high time for the supreme judicial tribunal of this state to reconsider its errors and to place its decisions on a higher and better plane. In this state the drainage statutes have been used to promote graft and jobbery, with big fees and expenses for drain commissioners and their attorneys. The drainage laws and decision have given a rich reward to jobbery and oppressive litigation. In 11 N. D. reports, there are decisions in fourteen drainage cases arising in Cass county, and in each case the sum total of the drainage assessment was twice the benefits. In each case the legal fight was a mere sham; it was a game with loaded dice. In the Erickson Case, supra, the total cost was $42,000, including $13,000 for attorneys' fees and commissioners' fees and junketing trips around the country. Bridges costing $500 or $600 were built for no possible use only to make costs; bridges that have lain there to rot, without any possibility of using them. This Erickson Case has been a blind leader of the blind. It has no support

in reason or in the cases cited to sustain it. It is directly contrary to the cases which are cited to sustain it.

As the Drainage Law was construed in the Erickson Case it is not constitutional. It puts the citizen completely at the mercy of the drain commissioners, permitting them to fix the total amount of an assessment against lands, including the charges of themselves and their attorneys and friends, without giving any notice to the owner of the land. Under the law of the land a person must have a fair hearing and a fair opportunity to contest the sum total of all costs and plunder that drain commissioners may charge against his land, and not merely a bootless opportunity to contest the rate or per cent of the amount. The one may be clearly right, and the other clearly outrageous.

Inasmuch as the Drainage Law gives no opportunity for a hearing on the sum total of all loot and costs the drain commissioners may cause to be extended as a lien and judgment against lands on the tax list, the law does in effect give judgment and execution without a hearing. Comp. Laws 1913, §§ 2474, 2479. Hence the law cannot be sustained without holding that the landowner has an ample remedy by a suit to abate any assessment in excess of benefits to his land. In the Erickson Case, 11 N. D. at page 498, 92 N. W. 841, it is said thus: "It is well settled that where a provision is made for notice to and hearing of each proprietor at some stage of the proceedings upon the question of what portion of the taxes shall be assessed upon his land, there is no taking of his property without due process of law." That proposition is grossly erroneous when applied to a special assessment, because, as we have said, the per cent may be just and reasonable, and the total amount may be outrageous. On this the court cites several decisions which hold directly to the contrary.

There is Hagar v. Reclamation Dist. 111 U. S. 701, 28 L. ed. 569, 4 Sup. Ct. Rep. 663. This was under the laws of California, and the special assessment was made without notice and sustained because it could only be enforced by legal proceedings in which the landowner might avail himself of any defense going either to the validity of the amount or of the assessment.

So in State ex rel. Dorgan v. Fisk, 15 N. D. 226, 107 N. W. 191, this court cites a Wisconsin and Nebraska case to sustain the power of commissioners to make drains and to levy assessments for the same.

But in Wisconsin the drain commissioners are appointed by the court, and authorized to assess the amount of benefits, and to report the same to the court, and then the court causes notice to be given to every person, and gives every person a fair opportunity to contest the amount, and even to call for a jury trial of the amount.

In Nebraska the statute makes the county commissioners a drainage board, and authorizes them to make assessments without notice; but the court holds that on such an assessment a party cannot be denied the right to a review by the courts.

In Hackney v. Elliott, 23 N. D. 373, 137 N. W. 433, Ex-Judge Goss wrote a thirty-seven page opinion on the drainage question, and concluded that the validity of the statute had been sustained by the United States Supreme Court. But the case was merely an appeal from a decision on demurrer, and it presented no question on the power of drain commissioners to levy a final assessment, without notice, or to act as judges in their own case. And the judges of this court may well take judicial notice of what is known to every person of common sense and observation in drainage cases, that a large bulk of the cost is composed of charges going into the pocket of the drainage commissioners. It is no uncommon thing for them to meet ten minutes on a day and charge up for a day's work, and to allow their attorney a fee of $1,000 as a retainer. That was the retainer in the Erickson Case.

In this case we must realize that drain commissioners act under a statutory power, which must be strictly observed. They are not judges; they have no judicial power. The statute gives them no power to expend $70,000 on the construction of a drain in a foreign country, and to charge the same against land in this state. Yet, that is what they have done in this case. Hence, as this court does not provide for a fair and just rating and adjustment of the legal charges against the lands, the result will be a multiplicity of suits, because every land-owner will have a perfect legal right to commence and maintain an action for himself to abate all illegal and excessive charges against his own land, and to abate any assessment in excess of actual benefits to the land. Of course so far as the special assessments have not yet been made and extended against any lands, there is nothing in the decision to prevent the same from being limited to actual benefits,—so as to avoid needless litigation.