# UNITED STATES STEEL CORP. ET AL. v. MULTISTATE TAX COMMISSION ET AL.

No. 76–635.   Argued October 11, 1977—Decided February 21, 1978

*Erwin N. Griswold* argued the cause for appellants. With him on the briefs were *Thomas McGanney, Richard A. Hoppe,* and *Todd B. Sollis.*

*William D. Dexter* argued the cause for appellees. With him on the brief was *Samuel N. Greenspoon.**

MR. JUSTICE POWELL delivered the opinion of the Court.

The Compact Clause of Art. I, § 10, cl. 3, of the Constitution provides: "No State shall, without the Consent of Congress, . . . enter into any Agreement or Compact with another State, or with a foreign Power . . . ." The Multistate Tax Compact, which established the Multistate Tax Commission, has not received congressional approval. This appeal requires us to decide whether the Compact is invalid for that reason. We also are required to decide whether it impermissibly encroaches on congressional power under the Commerce Clause and whether it operates in violation of the Fourteenth Amendment.

I

The Multistate Tax Compact was drafted in 1966 and became effective, according to its own terms, on August 4, 1967, after seven States had adopted it. By the inception of this litigation in 1972, 21 States had become members.[1] Its

---

*A brief of *amici curiae* urging affirmance was filed for their respective States by *William J. Baxley,* Attorney General of Alabama; *Bruce E. Babbitt,* Attorney General of Arizona; *Carl R. Ajello,* Attorney General of Connecticut; *Robert L. Shevin,* Attorney General of Florida; *Arthur K. Bolton,* Attorney General of Georgia; *William J. Scott,* Attorney General of Illinois; *Francis B. Burch,* Attorney General of Maryland; *Francis X. Bellotti,* Attorney General of Massachusetts; *Rufus L. Edmisten,* Attorney General of North Carolina; *Warren R. Spannaus,* Attorney General of Minnesota; *Brooks McLemore,* Attorney General of Tennessee; *Chauncey H. Browning, Jr.,* Attorney General of West Virginia; and for the State of Louisiana by *David Dawson.*

*John H. Larson* filed a brief for the County of Los Angeles as *amicus curiae.*

[1] Those States were: Alaska, Alaska Stat. Ann. § 43.19.010 (1977); Arkansas, Ark. Stat. Ann. § 84–4101 (Supp. 1977); Colorado, Colo. Rev. Stat. § 24–60–1301 (1973); Florida, Fla. Stat. § 213.15 (1971); Haw. Rev. Stat. § 255–1 (Supp. 1976); Idaho, Idaho Code § 63–3701 (1976); Illinois,

formation was a response to this Court's decision in *Northwestern States Portland Cement Co.* v. *Minnesota,* 358 U. S. 450 (1959), and the congressional activity that followed in its wake.

In *Northwestern States,* this Court held that net income from the interstate operations of a foreign corporation may be subjected to state taxation, provided that the levy is nondiscriminatory and is fairly apportioned to local activities that form a sufficient nexus to support the exercise of the taxing power. This prompted Congress to enact a statute, Act of Sept. 14, 1959, Pub. L. 86–272, 73 Stat. 555, which sets forth certain minimum standards for the exercise of that power.[2] It also authorized a study for the purpose of recommending legislation establishing uniform standards to be observed by the States in taxing income of interstate businesses. Although

---

Ill. Rev. Stat., ch. 120, § 871 (1973); Indiana, Ind. Code § 6–8–9–101 (1972); Kansas, Kan. Stat. Ann. § 79–4301 (1969); Michigan, Mich. Comp. Laws § 205.581 (1970); Missouri, Mo. Rev. Stat. § 32.200 (1969); Montana, Mont. Rev. Codes Ann. § 84–6701 (Supp. 1977); Nebraska, Neb. Rev. Stat. § 77–2901 (1943); Nevada, Nev. Rev. Stat. § 376.010 (1973); New Mexico, N. M. Stat. Ann. § 72–15A–37 (Supp. 1975); North Dakota, N. D. Cent. Code § 57–59–01 (1972); Oregon, Ore. Rev. Stat. § 305.655 (1977); Texas, Tex. Rev. Civ. Stat. Ann., Art. 7359a (Vernon Supp. 1977); Utah, Utah Code Ann. § 59–22–1 (1953 and Supp. 1977); Washington, Wash. Rev. Code § 82.56.010 (1974); Wyoming, Wyo. Stat. § 39–376 (Supp. 1975).

Since the suit began, four States—Florida, Illinois, Indiana, and Wyoming—have withdrawn from the Compact, see 1976 Fla. Laws, ch. 76–149, § 1; 1975 Ill. Laws, No. 79–639, § 1; 1977 Ind. Acts, No. 90; 1977 Wyo. Sess. Laws, ch. 44, § 1. Two others—California and South Dakota— have joined it, see Cal. Rev. & Tax. Code Ann. § 38001 (West Supp. 1977); S. D. Comp. Laws Ann. § 10–54–1 (Supp. 1977), for a current total of 19 members.

[2] Title I of Pub. L. 86–272, codified as 15 U. S. C. §§ 381–384, essentially forbids the imposition of a tax on a foreign corporation's net income derived from activities within a State, if those activities are limited to the solicitation of orders that are approved, filled, and shipped from a point outside the State.

the results of the study were published in 1964 and 1965,[3] Congress has not enacted any legislation dealing with the subject.[4]

While Congress was wrestling with the problem, the Multistate Tax Compact was drafted.[5] It symbolized the recognition that, as applied to multistate businesses, traditional state tax administration was inefficient and costly to both State and taxpayer. In accord with that recognition, Art. I of the Compact states four purposes: (1) facilitating proper determination of state and local tax liability of multistate taxpayers, including the equitable apportionment of tax bases and settlement of apportionment disputes; (2) promoting uniformity and compatibility in state tax systems; (3) facilitating taxpayer convenience and compliance in the filing of tax returns and in other phases of tax administration; and (4) avoiding duplicative taxation.

To these ends, Art. VI creates the Multistate Tax Commission, composed of the tax administrators from all the member States. Section 3 of Art. VI authorizes the Commission (i) to study state and local tax systems; (ii) to develop and recommend proposals for an increase in uniformity and compatibility of state and local tax laws in order to encourage simplicity and improvement in state and local tax law and administration; (iii) to compile and publish information that may assist member States in implementing the Compact and taxpayers in complying with the tax laws; and

---

[3] H. R. Rep. No. 1480, 88th Cong., 2d Sess. (1964); H. R. Rep. No. 565, 89th Cong., 1st Sess. (1965); H. R. Rep. No. 952, 89th Cong., 1st Sess. (1965).

[4] There have been several unsuccessful attempts. H. R. 11798, 89th Cong., 1st Sess. (1965); H. R. 16491, 89th Cong., 2d Sess. (1966); S. 317, 92d Cong., 1st Sess. (1971); H. R. 1538, 92d Cong., 1st Sess. (1971); S. 1245, 93d Cong., 1st Sess. (1973); H. R. 977, 93d Cong., 1st Sess. (1973); S. 2080, 94th Cong., 1st Sess. (1975); H. R. 9, 94th Cong., 1st Sess. (1975).

[5] The model Act proposed as the Multistate Tax Compact, with minor exceptions, has been adopted by each member State.

(iv) to do all things necessary and incidental to the administration of its functions pursuant to the Compact.

Articles VII and VIII detail more specific powers of the Commission. Under Art. VII, the Commission may adopt uniform administrative regulations in the event that two or more States have uniform provisions relating to specified types of taxes. These regulations are advisory only. Each member State has the power to reject, disregard, amend, or modify any rules or regulations promulgated by the Commission. They have no force in any member State until adopted by that State in accordance with its own law.

Article VIII applies only in those States that specifically adopt it by statute. It authorizes any member State or its subdivision to request that the Commission perform an audit on its behalf. The Commission, as the State's auditing agent, may seek compulsory process in aid of its auditing power in the courts of any State that has adopted Art. VIII. Information obtained by the audit may be disclosed only in accordance with the laws of the requesting State. Moreover, individual member States retain complete control over all legislation and administrative action affecting the rate of tax, the composition of the tax base (including the determination of the components of taxable income), and the means and methods of determining tax liability and collecting any taxes determined to be due.

Article X permits any party to withdraw from the Compact by enacting a repealing statute. The Compact's other provisions are of less relevance to the matter before us.[6]

---

[6] Article II consists of definitions. Article III permits small taxpayers—those whose only activities within the jurisdiction consist of sales totaling less than $100,000—to elect to pay a tax on gross sales in lieu of a levy on net income. The Uniform Division of Income for Tax Purposes Act, contained in Art. IV, allows multistate taxpayers to apportion and allocate their income under formulae and rules set forth in the Compact or by any other method available under state law. It was approved by the National Conference of Commissioners on Uniform State Laws and the American

In 1972, appellants brought this action on behalf of themselves[7] and all other multistate taxpayers threatened with audits by the Commission. They named the Commission, its individual Commissioners, and its Executive Director as defendants. Their complaint challenged the constitutionality of the Compact on four grounds: (1) the Compact, never having received the consent of Congress,[8] is invalid under the Compact Clause; (2) it unreasonably burdens interstate commerce; (3) it violates the rights of multistate taxpayers under the Fourteenth Amendment; and (4) its audit provisions violate the Fourth and Fourteenth Amendments. Appellants sought a declaratory judgment that the Compact is invalid and a permanent injunction barring its operation.

The complaint survived a motion to dismiss. 367 F. Supp. 107 (SDNY 1973). After extensive discovery, appellees moved for summary judgment. A three-judge District Court,

Bar Association in 1957. Article V deals with sales and use taxes. Article IX provides for arbitration of disputes, but is not in effect. Article XI disclaims any attempt to affect the power of member States to fix rates of taxation or limit the jurisdiction of any court. Finally, Art. XII provides for liberal construction and severability.

[7] The action was filed by United States Steel Corp., Standard Brands Inc., General Mills, Inc., and the Procter & Gamble Distributing Co. On February 5, 1974, the court below permitted Bethlehem Steel Corp., Bristol Myers Co., Eltra Corp., Goodyear Tire & Rubber Co., Green Giant Co., International Business Machines Corp., International Harvester Co., International Paper Co., International Telephone & Telegraph Corp., McGraw-Hill, Inc., NL Industries, Inc., Union Carbide Corp., and Xerox Corp. to intervene as plaintiffs. The court below ordered that the suit proceed as a class action. International Business Machines and Xerox withdrew as intervenor plaintiffs before decision.

[8] Congressional consent has been sought, but never obtained. See S. 3892, 89th Cong., 2d Sess. (1966); S. 883, 90th Cong., 1st Sess. (1967); S. 1551, 90th Cong., 1st Sess. (1967); H. R. 9476, 90th Cong., 1st Sess. (1967); H. R. 13682, 90th Cong., 1st Sess. (1967); S. 1198, 91st Cong., 1st Sess. (1969); H. R. 6246, 91st Cong., 1st Sess. (1969); H. R. 9873, 91st Cong., 1st Sess. (1969); S. 1883, 92d Cong., 1st Sess. (1971); H. R. 6160, 92d Cong., 1st Sess. (1971); S. 3333, 92d Cong., 2d Sess. (1972); S. 2092, 93d Cong., 1st Sess. (1973).

convened pursuant to 28 U. S. C. § 2281, rejected appellants' claim that the record would not support summary judgment. 417 F. Supp. 795, 798 (SDNY 1976). Turning to the merits, the District Court first rejected the contention that the Compact Clause requires congressional consent to every agreement between two or more States. The court cited *Virginia* v. *Tennessee,* 148 U. S. 503 (1893), and *New Hampshire* v. *Maine,* 426 U. S. 363 (1976), in support of its holding that consent is necessary only in the case of a compact that enhances the political power of the member States in relation to the Federal Government. The District Court found neither enhancement of state political power nor encroachment upon federal supremacy. Concluding that appellants' Commerce Clause, Fourth Amendment, and Fourteenth Amendment claims also lacked merit, the District Court granted summary judgment for appellees.

Before this Court, appellants have abandoned their search-and-seizure claim. Although they preserved their claim relating to the propriety of summary judgment, we find no reason to disturb the conclusion of the court below on that point. We have before us, therefore, appellant's contentions under the Compact Clause, the Commerce Clause, and the Fourteenth Amendment. We consider first the Compact Clause contention.

## II

Read literally, the Compact Clause would require the States to obtain congressional approval before entering into any agreement among themselves, irrespective of form, subject, duration, or interest to the United States. The difficulties with such an interpretation were identified by Mr. Justice Field in his opinion for the Court in *Virginia* v. *Tennessee, supra.* His conclusion that the Clause could not be read literally was approved in subsequent dicta,[9] but this Court did not have

---

[9] *E. g., Wharton* v. *Wise,* 153 U. S. 155, 168–170 (1894); *North Carolina* v. *Tennessee,* 235 U. S. 1, 16 (1914).

occasion expressly to apply it in a holding until our recent decision in *New Hampshire* v. *Maine, supra.*

Appellants urge us to abandon *Virginia* v. *Tennessee* and *New Hampshire* v. *Maine,* but provide no effective alternative other than a literal reading of the Compact Clause. At this late date, we are reluctant to accept this invitation to circumscribe modes of interstate cooperation that do not enhance state power to the detriment of federal supremacy. We have examined, nevertheless, the origin and development of the Clause, to determine whether history lends controlling support to appellants' position.

Article I, § 10, cl. 1, of the Constitution—the Treaty Clause—declares: "No State, shall enter into Any Treaty, Alliance or Confederation . . . ." Yet Art. I, § 10, cl. 3—the Compact Clause—permits the States to enter into "agreements" or "compacts," so long as congressional consent is obtained. The Framers clearly perceived compacts and agreements as differing from treaties.[10] The records of the Consti-

---

[10] The history of interstate agreements under the Articles of Confederation suggests the same distinction between "treaties, alliances, and confederations" on the one hand, and "agreements and compacts" on the other. Article VI provided in part as follows:

"No State without the consent of the United States, in Congress assembled, shall send any embassy to, or receive any embassy from, or enter into any confe[r]ence, agreement, alliance or treaty, with any king, prince or state . . . .

"No two or more States shall enter into any treaty, confederation, or alliance whatever, between them, without the consent of the United States, in Congress assembled, specifying accurately the purposes for which the same is to be entered into, and how long it shall continue."

Congressional consent clearly was required before a State could enter into an "agreement" with a foreign state or power or before two or more States could enter into "treaties, alliances, or confederations." Apparently, however, consent was not required for mere "agreements" between States. "The articles inhibiting any treaty, confederation, or alliance between the States without the consent of Congress . . . were not designed to prevent arrangements between adjoining States to facilitate the free intercourse

tutional Convention, however, are barren of any clue as to the precise contours of the agreements and compacts governed by the Compact Clause.[11]  This suggests that the Framers used

of their citizens, or remove barriers to their peace and prosperity . . . ." *Wharton* v. *Wise, supra,* at. 167.

For example, the Virginia-Maryland Compact of 1785, which governed navigation and fishing rights in the Potomac River, the Pocomoke River, and the Chesapeake Bay, did not receive congressional approval, yet no question concerning its validity under Art. VI ever arose.  As the Court noted in *Wharton* v. *Wise,* in reference to the 1785 Compact, "looking at the object evidently intended by the prohibition of the Articles of Confederation, we are clear they were not directed against agreements of the character expressed by the compact. under consideration.  Its execution could in no respect encroach upon or weaken the general authority of Congress under those articles.  Various compacts were entered into between Pennsylvania and New Jersey and between Pennsylvania and Virginia, during the Confederation, in reference to boundaries between them, and to rights of fishery in their waters, and to titles to land in their respective States, without the consent of Congress, which indicated that such consent was not deemed essential to their validity."  153 U. S., at 170–171.

[11] On July 25, 1787, the Convention created a Committee of Detail composed of John Rutledge, James Wilson, Edmund Randolph, Nathaniel Gorham, and Oliver Elsworth.  The Convention then adjourned until August 6 to allow the Committee to prepare a draft.  2 M. Farrand, Records of the Federal Convention of 1787, pp. 97, 128 (1911).  Section 10 of the Committee's first draft provided in part: "No State shall enter into any Treaty, Alliance or Confederation with any foreign Power. nor witht. Const. of U. S. into any agreemt. or compact wh another State or Power . . . ."  *Id.,* at 169 (abbreviations in original).  On August 6, the Committee submitted a draft to the Convention containing the following articles:

"XII  No State shall . . . enter into any treaty, alliance, or confederation . . . .

"XIII  No State, without the consent of the Legislature of the United States, shall . . . enter into any agreement or compact with another State, or with any foreign power . . . ."  *Id.,* at 187.

The Committee of Style, created to revise the draft, reported on September 12, *id.,* at 590, but nothing appears to have been said about Art. I, § 10, which contained the treaty and compact language incor-

the words "treaty," "compact," and "agreement" as terms of art, for which no explanation was required [12] and with which we are unfamiliar.  Further evidence that the Framers ascribed

porated into the Constitution as approved on September 17.  The records of the state ratification conventions also shed no light.  Publius declared only that the prohibition against treaties, alliances, and confederation, "for reasons which need no explanation, is copied into the new Constitution," while the portion of Art. I, § 10, containing the Compact Clause fell "within reasonings which are either so obvious, or have been so fully developed, that they may be passed over without remark."  The Federalist, No. 44, pp. 299, 302 (J. Cooke ed. 1961) (J. Madison).

[12] Some commentators have theorized that the Framers understood those terms in relation to the precisely defined categories, fashionable in the contemporary literature of international law, of accords between sovereigns.  See, e. g., Engdahl, Characterization of Interstate Arrangements: When Is a Compact Not a Compact?, 64 Mich. L. Rev. 63 (1965); Weinfeld, What Did the Framers of the Federal Constitution Mean by "Agreements or Compacts"?, 3 U. Chi. L. Rev. 453 (1936).  The international jurist most widely cited in the first 50 years after the Revolution was Emmerich de Vattel.  1 J. Kent, Commentaries on American Law 18 (1826).  In 1775, Benjamin Franklin acknowledged receipt of three copies of a new edition, in French, of Vattel's Law of Nations and remarked that the book "has been continually in the hands of the members of our Congress now sitting . . . ."  2 F. Wharton, United States Revolutionary Diplomatic Correspondence 64 (1889), cited in Weinfeld, supra, at 458.

Vattel differentiated between "treaties," which were made either for perpetuity or for a considerable period, and "agreements, conventions, and pactions," which "are perfected in their execution once for all."  E. Vattel, Law of Nations 192 (J. Chitty ed. 1883).  Unlike a "treaty" or "alliance," an "agreement" or "paction" was perfected upon execution:

"[T]hose compacts, which are accomplished once for all, and not by successive acts,—are no sooner executed then they are completed and perfected.  If they are valid, they have in their own nature a perpetual and irrevocable effect . . . ."  Id., at 208.

This distinction between supposedly ongoing accords, such as military alliances, and instantaneously executed, though perpetually effective, agreements, such as boundary settlements, may have informed the drafting in Art. I, § 10.  The Framers clearly recognized the necessity for amicable resolution of boundary disputes and related grievances.  See Virginia v. West Virginia, 246 U. S. 565, 597–600 (1918); Frankfurter & Landis, The

precise meanings to these words appears in contemporary commentary.[13]

Whatever distinct meanings the Framers attributed to the terms in Art. I, § 10, those meanings were soon lost. In 1833, Mr. Justice Story perceived no clear distinction among any of the terms.[14] Lacking any clue as to the categorical defini-

---

Compact Clause of the Constitution—A Study in Interstate Adjustments, 34 Yale L. J. 685, 692–695 (1925). Interstate agreements were a method with which they were familiar. *Id.*, at 694, 732–734. Although these dispositive compacts affected the interests of the States involved, they did not represent the continuing threat to the other States embodied in a "treaty of alliance," to use Vattel's words. E. Vattel, *supra,* at 192.

[13] St. George Tucker, who along with Madison and Edmund Randolph was a Virginia commissioner to the Annapolis Convention of 1786, drew a distinction between "treaties, alliances, and confederations" on the one hand, and "agreements or compacts" on the other:

"The former relate ordinarily to subjects of great national magnitude and importance, and are often perpetual, or made for a considerable period of time; the power of making these is altogether prohibited to the individual states; but agreements, or compacts, concerning transitory or local affairs, or such as cannot possibly affect any other interest but that of the parties, may still be entered into by the respective states, with the consent of congress." 1 W. Blackstone, Commentaries, Appendix 310 (S. Tucker ed. 1803) (footnotes omitted).

Tucker cited Vattel as authority for his interpretation of Art. I, § 10.

[14] Mr. Justice Story found Tucker's view, see n. 13, *supra,* unilluminating:

"What precise distinction is here intended to be taken between *treaties,* and *agreements,* and *compacts,* is nowhere explained, and has never as yet been subjected to any exact judicial or other examination. A learned commentator, however, supposes, that the former ordinarily relate to subjects of great national magnitude and importance, and are often perpetual, or for a great length of time; but that the latter relate to transitory or local concerns, or such as cannot possibly affect any other interests but those of the parties [citing Tucker]. But this is at best a very loose and unsatisfactory exposition, leaving the whole matter open to the most latitudinarian construction. What are subjects of great national magnitude and importance? Why may not a compact or agreement between States be perpetual? If it may not, what shall be its duration? Are not treaties often made for short periods, and upon questions of local interest, and for

tions the Framers had ascribed to them, Mr. Justice Story developed his own theory. Treaties, alliances, and confederations, he wrote, generally connote military and political accords and are forbidden to the States. Compacts and agreements, on the other hand, embrace "mere private rights of sovereignty; such as questions of boundary; interests in land situate in the territory of each other; and other internal regulations for the mutual comfort and convenience of States bordering on each other." 2 J. Story, Commentaries on the Constitution of the United States § 1403, p. 264 (T. Cooley ed. 1873). In the latter situations, congressional consent was required, Story felt, "in order to check any infringement of the rights of the national government." *Ibid.*

The Court's first opportunity to comment on the scope of the Compact Clause, *Holmes* v. *Jennison,* 14 Pet. 540 (1840), proved inconclusive. Holmes had been arrested in Vermont on a warrant issued by Jennison, the Governor. The warrant apparently reflected an informal agreement by Jennison to deliver Holmes to authorities in Canada, where he had been indicted for murder. On a petition for habeas corpus, the Supreme Court of Vermont held Holmes' detention lawful. Although this Court divided evenly on the question of its jurisdiction to review the decision, Mr. Chief Justice Taney, in an opinion joined by Mr. Justice Story and two others, addressed the merits of Holmes' claim that Jennison's informal agreement to surrender him fell within the scope of the Compact

---

temporary objects?" 2 J. Story, Commentaries on the Constitution of the United States § 1402, p. 263 (T. Cooley ed. 1873) (footnotes omitted).

In *Green* v. *Biddle,* 8 Wheat. 1 (1823), the Court, including Mr. Justice Story, had been presented with a question of the validity of the Virginia-Kentucky Compact of 1789, to which Congress had never expressly assented. Henry Clay argued to the Court that the Compact Clause extended "to all agreements or compacts, no matter what is the subject of them. It is immaterial, therefore, whether that subject be harmless or dangerous to the Union." *Id.,* at 39. The Court did not address that issue, however, for it held that Congress' consent could be implied. *Id.,* at 87.

Clause. Mr. Chief Justice Taney focused on the fact that the agreement in question was between a State and a foreign government. Since the clear intention of the Framers had been to cut off all communication between the States and foreign powers, *id.*, at 568–579, he concluded that the Compact Clause would permit an arrangement such as the one at issue only if "made under the supervision of the United States . . . ," *id.*, at 578. In his separate opinion, Mr. Justice Catron expressed disquiet over what he viewed as Mr. Chief Justice Taney's literal reading of the Compact Clause, noting that it might threaten agreements between States theretofore considered lawful.[15]

Despite Mr. Justice Catron's fears, courts faced with the task of applying the Compact Clause appeared reluctant to strike down newly emerging forms of interstate cooperation.[16] For example, in *Union Branch R. Co.* v. *East Tennessee & G. R. Co.*, 14 Ga. 327 (1853), the Supreme Court of Georgia rejected a Compact Clause challenge to an agreement between Tennessee and Georgia concerning the construction of an interstate railroad. Omitting any mention of *Holmes* v. *Jennison*, the Georgia court seized upon Story's observation that the words "treaty, alliance, and confederation" generally were known to

---

[15] Notwithstanding Mr. Justice Catron's unease, Mr. Chief Justice Taney's opinion in *Jennison* is not inconsistent with the rule of *Virginia* v. *Tennessee*. At some length, Taney emphasized that the State was exercising the power to extradite persons sought for crimes in other countries, which was part of the exclusive foreign relations power expressly reserved to the Federal Government. He concluded, therefore, that the State's agreement would be constitutional only if made under the supervision of the United States.

After the *Jennison* case had been disposed of by the Court, the Vermont court discharged Holmes. It concluded from an examination of the five separate opinions in the case that a majority of this Court believed the Governor had no power to deliver Holmes to Canadian authorities. *Holmes* v. *Jennison*, 14 Pet. 540, 597 (1840) (Reporter's Note).

[16] See generally Abel, Interstate Cooperation as a Child, 32 Iowa L. Rev. 203 (1947); Engdahl, *supra*, n. 12, at 86.

apply to treaties of a political character. Without explanation, the court transferred this description of the Treaty Clause to the Compact Clause, which it perceived as restraining the power of the States only with respect to agreements "which might limit, or infringe upon a full and complete execution by the General Government, of the powers-intended to be delegated by the Federal Constitution . . . ." 14 Ga., at 339.[17] A broader prohibition could not have been intended, since it was unnecessary to protect the Federal Government.[18] Unless this view was taken, said the court:

"We must hold that a State, without the consent of

---

[17] The court failed to mention that Story described the terms of the Treaty Clause, not the Compact Clause, as political. It was the political character of treaties, in his view, that led to their absolute prohibition. Story theorized that the Compact Clause dealt with "private rights of sovereignty," see *supra*, at 464, but that congressional consent was required to prevent possible abuses.

[18] Taking a similar view of the Compact Clause, and also ignoring *Holmes* v. *Jennison*, were *Dover* v. *Portsmouth Bridge*, 17 N. H. 200 (1845), and *Fisher* v. *Steele*, 39 La. Ann. 447, 1 So. 882 (1887). *Holmes* v. *Jennison* apparently was not cited in a case relating to the Compact Clause until 1917, 14 years after Mr. Justice Field formulated the rule of *Virginia* v. *Tennessee*. See *McHenry County* v. *Brady*, 37 N. D. 59, 70, 163 N. W. 540, 544 (1917).

Mr. Chief Justice Taney may have shared the Georgia court's view of compacts which, unlike the "agreement" in *Holmes* v. *Jennison*, did not implicate the foreign relations power of the United States. A year after *Union Branch R. Co.* was decided, he suggested in dictum that the Compact Clause is aimed at an accord that is "in its nature, a political question, to be settled by compact made by the political departments of the government." *Florida* v. *Georgia*, 17 How. 478, 494 (1855). The purpose of the Clause, he declared, is "to guard the rights and interests of the other States, and to prevent any compact or agreement between any two States, which might affect injuriously the interest of the others." A similar concern with agreements of a political nature may be found in a dictum of Mr. Chief Justice Marshall:

"It is worthy of remark, too, that these inhibitions [of Art. I, §10]

Congress, can make no sort of contract, whatever, with another State. That it cannot sell to another state, any portion of public property, . . . though it may so sell to individuals. . . .

"We can see no advantage to be gained by, or benefit in such a provision; and hence, we think it was not intended." *Id.*, at 340.

It was precisely this approach that formed the basis in 1893 for Mr. Justice Field's interpretation of the Compact Clause in *Virginia* v. *Tennessee.* In that case, the Court held that Congress tacitly had assented to the running of a boundary between the two States. In an extended dictum, however, Mr. Justice Field took the Court's first opportunity to comment upon the Compact Clause since the neglected essay in *Holmes* v. *Jennison.* Mr. Justice Field, echoing the puzzlement expressed by Story 60 years earlier, observed:

"The terms 'agreement' or 'compact' taken by themselves are sufficiently comprehensive to embrace all forms of stipulation, written or verbal, and relating to all kinds of subjects; to those to which the United States can have no possible objection or have any interest in interfering with, as well as to those which may tend to increase and build up the political influence of the contracting States, so as to encroach upon or impair the supremacy of the United States or interfere with their rightful management of particular subjects placed under their entire control." 148 U. S., at 517–518.

---

generally restrain state legislation on subjects entrusted to the general government, or in which the people of all the states feel an interest.

"A state is forbidden to enter into any treaty, alliance or confederation. If these compacts are with foreign nations, they interfere with the treaty making power which is conferred entirely on the general government; if with each other, for political purposes, they can scarcely fail to interfere with the general purpose and intent of the constitution." *Barron* v. *Baltimore,* 7 Pet. 243, 249 (1833).

Mr. Justice Field followed with four examples of interstate agreements that could in "no respect concern the United States": (1) an agreement by one State to purchase land within its borders owned by another State; (2) an agreement by one State to ship merchandise over a canal owned by another; (3) an agreement to drain a malarial district on the border between two States; and (4) an agreement to combat an immediate threat, such as invasion or epidemic. As the Compact Clause could not have been intended to reach every possible interstate agreement, it was necessary to construe the terms of the Compact Clause by reference to the object of the entire section in which it appears: [19]

> "Looking at the clause in which the terms 'compact' or 'agreement' appear, it is evident that the prohibition is directed to the formation of any combination tending to the increase of political power in the States, which may encroach upon or interfere with the just supremacy of the United States." *Id.,* at 519.

Mr. Justice Field reiterated this functional view of the Compact Clause a year later in *Wharton* v. *Wise,* 153 U. S. 155, 168–170 (1894).

Although this Court did not have occasion to apply Mr. Justice Field's test for many years, it has been cited with approval on several occasions. *Louisiana* v. *Texas,* 176 U. S. 1, 17 (1900); *Stearns* v. *Minnesota,* 179 U. S. 223, 246–248 (1900); *North Carolina* v. *Tennessee,* 235 U. S. 1, 16 (1914).[20]

---

[19] In support of this conclusion, Mr. Justice Field misread Story's Commentaries in precisely the same way as the Georgia court did in *Union Branch R. Co.* See n. 17, *supra.*

[20] State courts repeatedly have applied the test in confirming the validity of a variety of interstate agreements. *E. g., McHenry County* v. *Brady, supra; Dixie Wholesale Grocery, Inc.* v. *Martin,* 278 Ky. 705, 129 S. W. 2d 181, cert. denied, 308 U. S. 609 (1939); *Ham* v. *Maine-New Hampshire Interstate Bridge Authority,* 92 N. H. 268, 30 A. 2d 1 (1943); *Roberts Tobacco Co.* v. *Department of Revenue,* 322 Mich. 519, 34 N. W.

Moreover, several decisions of this Court have upheld a variety of interstate agreements effected through reciprocal legislation without congressional consent. *E. g., St. Louis & S. F. R. Co.* v. *James,* 161 U. S. 545 (1896); *Hendrick* v. *Maryland,* 235 U. S. 610 (1915); *Bode* v. *Barrett,* 344 U. S. 583 (1953); *New York* v. *O'Neill,* 359 U. S. 1 (1959). While none of these cases explicitly applied the *Virginia* v. *Tennessee* test, they reaffirmed its underlying assumption: not all agreements between States are subject to the strictures of the Compact Clause.[21] In *O'Neill,* for example, this Court upheld the Uniform Law to Secure the Attendance of Witnesses from Within or Without

---

2d 54 (1948); *Bode* v. *Barrett,* 412 Ill. 204, 106 N. E. 2d 521 (1952), aff'd, 344 U. S. 583 (1953); *Landes* v. *Landes,* 1 N. Y. 2d 358, 135 N. E. 2d 562, appeal dismissed, 352 U. S. 948 (1956); *Ivey* v. *Ayers,* 301 S. W. 2d 790 (Mo. 1957); *State* v. *Doe,* 149 Conn. 216, 178 A. 2d 271 (1962); *General Expressways, Inc.* v. *Iowa Reciprocity Board,* 163 N. W. 2d 413 (Iowa, 1968); *Kinnear* v. *Hertz Corp.,* 86 Wash. 2d 407, 545 P. 2d 1186 (1976). See also *Henderson* v. *Delaware River Joint Toll Bridge Comm'n,* 362 Pa. 475, 66 A. 2d 843 (1949); *Opinion of the Justices,* 344 Mass. 770, 184 N. E. 2d 353 (1962); *State* v. *Ford,* 213 Tenn. 582, 376 S. W. 2d 486 (1964); *Dresden School Dist.* v. *Hanover School Dist.,* 105 N. H. 286, 198 A. 2d 656 (1964); *Colgate-Palmolive Co.* v. *Dorgan,* 225 N. W. 2d 278 (N. D. 1974).

[21] One commentator has noted the relevance of reciprocal-legislation cases, particularly those involving reciprocal tax statutes, to Compact Clause adjudication:

"Compact clause adjudication focuses on a federalism formula suggested in an 1893 Supreme Court case [*Virginia* v. *Tennessee*]: congressional consent is required to validate only those compacts infringing upon 'the political power or influence' of particular states and 'encroaching . . . upon the full and free exercise of Federal authority.' Reciprocal tax statutes, which provide the paradigm instance of arrangements not deemed to require the consent of Congress, illustrate this principle in that they neither project a new presence onto the federal system nor alter any state's basic sphere of authority." Tribe, Intergovernmental Immunities in Litigation, Taxation, and Regulation: Separation of Powers Issues in Controversies about Federalism, 89 Harv. L. Rev. 682, 712 (1976) (footnotes omitted).

the State in Criminal Proceedings, which had been enacted in 41 States and Puerto Rico. That statute permitted the judge of a court of any enacting State to invoke the process of the courts of a sister State for the purpose of compelling the attendance of witnesses at criminal proceedings in the requesting State. Although no Compact Clause question was directly presented, the Court's opinion touched upon similar concerns:

"The Constitution did not purport to exhaust imagination and resourcefulness in devising fruitful interstate relationships. It is not to be construed to limit the variety of arrangements which are possible through the voluntary and cooperative actions of individual States with a view to increasing harmony within the federalism created by the Constitution. Far from being divisive, this legislation is a catalyst of cohesion. It is within the unrestricted area of action left to the States by the Constitution." 359 U. S., at 6.

The reciprocal-legislation cases support the soundness of the *Virginia* v. *Tennessee* rule, since the mere form of the interstate agreement cannot be dispositive. Agreements effected through reciprocal legislation [22] may present opportunities for enhancement of state power at the expense of the federal supremacy similar to the threats inherent in a more formalized "compact." Mr. Chief Justice Taney considered this point in *Holmes* v. *Jennison,* 14 Pet., at 573:

"Can it be supposed, that the constitutionality of the act depends on the mere form of the agreement? We think not. The Constitution looked to the essence and substance of things, and not to mere form. It would be but an evasion of the constitution to place the question upon the formality with which the agreement is made."

The Clause reaches both "agreements" and "compacts," the

[22] See also Frankfurter & Landis, *supra,* n. 12, at 690–691.

formal as well as the informal.[23]   The relevant inquiry must be one of impact on our federal structure.

   This was the status of the *Virginia* v. *Tennessee* test until two Terms ago, when we decided *New Hampshire* v. *Maine*, 426 U. S. 363 (1976).   In that case we specifically applied the test and held that an interstate agreement locating an ancient boundary did not require congressional consent.   We reaffirmed Mr. Justice Field's view that the "application of the Compact Clause is limited to agreements that are 'directed to the formation of any combination tending to the increase of political power in the States, which may encroach upon or interfere with the just supremacy of the United States.' " *Id.*, at 369, quoting *Virginia* v. *Tennessee*, 148 U. S., at 519. This rule states the proper balance between federal and state power with respect to compacts and agreements among States.

   Appellants maintain that history constrains us to limit application of this rule to bilateral agreements involving no independent administrative body.   They argue that this Court never has upheld a multilateral agreement creating an active administrative body with extensive powers delegated to it by the States, but lacking congressional consent.   It is true that most multilateral compacts have been submitted for congressional approval.   But this historical practice, which may simply reflect considerations of caution and convenience on the part of the submitting States, is not controlling.[24]   It

---

[23] Although there is language in *West Virginia ex rel. Dyer* v. *Sims*, 341 U. S. 22, 27 (1951), that could be read to suggest that the formal nature of a "compact" distinguishes it from reciprocal legislation, that language, properly understood, does not undercut our analysis.   Referring in dictum to the compact at issue in *Dyer*, Mr. Justice Frankfurter observed that congressional consent had been required, "as for all compacts."   The word "compact" in that phrase must be understood as a term of art, meaning those agreements falling within the scope of the Compact Clause. Cf. Frankfurter & Landis, *supra* n. 12, at 690, and n. 22a.   Otherwise, the word "agreement" is read out of Art. I, § 10, cl. 3, entirely.

[24] Appellants describe various Compacts, including the Interstate Com-

is also true that the precise interstate mechanism involved in this case has not been presented to this Court before. *New York* v. *O'Neill, supra,* however, involving analogous multilateral arrangements, stands as an implicit rejection of appellants' proposed limitation of the *Virginia* v. *Tennessee* rule.

Appellants further urge that the pertinent inquiry is one of potential, rather than actual, impact upon federal supremacy. We agree. But the multilateral nature of the agreement and its establishment of an ongoing administrative body do not, standing alone, present significant potential for conflict with the principles underlying the Compact Clause. The number of parties to an agreement is irrelevant if it does not impermissibly enhance state power at the expense of federal supremacy. As to the powers delegated to the administrative body, we think these also must be judged in terms of enhancement of state power in relation to the Federal Government. See *Virginia* v. *Tennessee, supra,* at 520 (establishment of commission to run boundary not a "compact"). We turn, therefore, to the application of the *Virginia* v. *Tennessee* rule to the Compact before us.

## III

On its face the Multistate Tax Compact contains no provisions that would enhance the political power of the member States in a way that encroaches upon the supremacy of the United States. There well may be some incremental

---

pact to Conserve Oil and Gas Act of 1935, 49 Stat. 939, and the Interstate Compact to Conserve Oil and Gas (Extension) of 1976, 90 Stat. 2365, and attempt to show that they are similar to the Compact before us. They then point out that the Compacts they describe received the consent of Congress and argue from this fact that the Multistate Tax Compact also must receive congressional consent in order to be valid. These other Compacts are not before us. We have no occasion to decide whether congressional consent was necessary to their constitutional operation, nor have we any reason to compare those Compacts to the one before us. It suffices to test the Multistate Tax Compact under the rule of *Virginia* v. *Tennessee.*

increase in the bargaining power of the member States *quoad* the corporations subject to their respective taxing jurisdictions. Group action in itself may be more influential than independent actions by the States. But the test is whether the Compact enhances state power *quoad* the National Government. This pact does not purport to authorize the member States to exercise any powers they could not exercise in its absence. Nor is there any delegation of sovereign power to the Commission; each State retains complete freedom to adopt or reject the rules and regulations of the Commission. Moreover, as noted above, each State is free to withdraw at any time. Despite this apparent compatibility of the Compact with the interpretation of the Clause established by our cases, appellants argue that the Compact's effect is to threaten federal supremacy.

## A

Appellants contend initially that the Compact encroaches upon federal supremacy with respect to interstate commerce. This argument, as we understand it, has four principal components. It is claimed, first, that the Commission's use in its audits of "unitary business" and "combination of income" methods [25] for determining a corporate taxpayer's income creates a risk of multiple taxation for multistate businesses. Whether or not this risk is a real one, it cannot be attributed to the existence of the Multistate Tax Commission. When the Commission conducts an audit at the request of a member

---

[25] The "unitary business" technique involves calculating a corporate taxpayer's net income on the basis of all phases of the operation of a single enterprise (*e. g.*, production of components, assembly, packing, distribution, sales), even if located outside the jurisdiction. The portion of that income attributable to activities within the taxing State is then determined by means of an apportionment formula. See, *e. g.*, *Underwood Typewriter Co.* v. *Chamberlain*, 254 U. S. 113 (1920). "Combination of income" involves applying the unitary business concept to separately incorporated entities engaged in a single enterprise. See *Edison California Stores, Inc.* v. *McColgan*, 30 Cal. 2d 472, 183 P. 2d 16 (1947).

State, it uses the methods adopted by that State. Since appellants do not contest the right of each State to adopt these procedures if it conducted the audits separately,[26] they cannot be heard to complain that a threat to federal supremacy arises from the Commission's adoption of the unitary-business standard in accord with the wishes of the member States. Indeed, to the extent that the Commission succeeds in promoting uniformity in the application of state taxing principles, the risks of multiple taxation should be diminished.

Appellants' second contention as to enhancement of state power over interstate commerce is that the Commission's regulations provide for apportionment of nonbusiness income. This allegedly creates a substantial risk of multiple taxation, since other States are said to allocate this income to the place of commercial domicile.[27] We note first that the regulations of the Commission do not require the apportionment of nonbusiness income. They do define business income, which is apportionable under the regulations, to include elements that

---

[26] Individual States are free to employ the unitary-business standard. *Underwood Typewriter Co.* v. *Chamberlain, supra;* accord, *Bass, Ratcliff & Gretton, Ltd.* v. *State Tax Comm'n,* 266 U. S. 271 (1924). Nor do appellants claim that individual States could not employ the combination method of determining taxpayer income. Cf. *Edison California Stores, supra.*

[27] Taxable income deemed *apportionable* is that which is not considered to have its source totally within one State. It is distributed by means of an apportionment formula among the States in which the multistate business operates. Taxable income deemed *allocable* is that which is considered as having its source within one State and is assigned entirely to that State for tax purposes. See generally Sharpe, State Taxation of Interstate Businesses and the Multistate Tax Compact: The Search for a Delicate Uniformity, 11 Colum. J. Law & Soc. Prob. 231, 233–239 (1975). "Business income" is defined generally as income arising from activities in the regular course of the taxpayer's business. See, *e. g.,* Uniform Division of Income for Tax Purposes Act § 1 (a). Definitions of income arising in the regular course of business vary from one State to another. For example, rents and royalties may be considered business income in one State, but not in another. See generally Sharpe, *supra,* at 233–239.

might be regarded as nonbusiness income in some States. P–H State & Local Tax Serv. ¶¶ 6100–6286 (1973). But again there is no claim that the member States could not adopt similar definitions in the absence of the Compact. Any State's ability to exact additional tax revenues from multistate businesses cannot be attributed to the Compact; it is the result of the State's freedom to select, within constitutional limits, the method it prefers.

The third aspect of the Compact's operation said to encroach upon federal commerce power involves the Commission's requirement that multistate businesses under audit file data concerning affiliated corporations. Appellants argue that the costs of compiling financial data of related corporations burden the conduct of interstate commerce for the benefit of the taxing States. Since each State presumably could impose similar filing requirements individually, however, appellants again do not show that the Commission's practices, as auditing agent for member States, aggrandize their power or threaten federal control of commerce. Moreover, to the extent that the Commission is engaged in joint audits, appellants' filing burdens well may be reduced.

Appellants' final claim of enhanced state power with respect to commerce is that the "enforcement powers" conferred upon the Commission enable that body to exercise authority over interstate business to a greater extent than the sum of the States' authority acting individually. This claim also falls short of meeting the standard of *Virginia* v. *Tennessee.* Article VIII of the Compact authorizes the Commission to require the attendance of persons and the production of documents in connection with its audits. The Commission, however, has no power to punish failures to comply. It must resort to the courts for compulsory process, as would any auditing agent employed by the individual States. The only novel feature of the Commission's "enforcement powers" is the provision in Art. VIII permitting the Commission to resort to the courts of any State adopting that Article. Adoption of the Article, then,

amounts to nothing more than reciprocal legislation for providing mutual assistance to the auditors of the member States. Reciprocal legislation making the courts of one State available for the better administration of justice in another has been upheld by this Court as a method "to accomplish fruitful and unprohibited ends." *New York* v. *O'Neill,* 359 U. S., at 11. Appellees make no showing that increased effectiveness in the administration of state tax laws, promoted by such legislation,[28] threatens federal supremacy. See n. 21, *supra.*

### B

Appellants further argue that the Compact encroaches upon the power of the United States with respect to foreign relations. They contend that the Commission has conducted multinational audits in which it applied the unitary business method to foreign corporate taxpayers, in conflict with federal policy concerning the taxation of foreign corporations.[29]

---

[28] For example, appellants raise no challenge to the many reciprocal statutes providing for recovery of taxes owing to one State in the courts of another. A typical statute is Tennessee's: "Any state of the United States or the political subdivisions thereof shall have the right to sue in the courts of Tennessee to recover any tax which may be owing to it when the like right is accorded to the state of Tennessee and its political subdivisions by such state." Tenn. Code Ann. § 20–1709 (1955). See generally Leflar, Out-of-State Collection of State and Local Taxes, 29 Vand. L. Rev. 443 (1976).

[29] Tax Convention with the United Kingdom of Great Britain and Northern Ireland, 94th Cong., 2d Sess. (1976) (as published in Message from President submitting Convention); Protocol to the 1975 Tax Convention with the United Kingdom of Great Britain and Northern Ireland, 94th Cong., 2d Sess. (1976) (as published in Message from President submitting Protocol); Second Protocol to the 1975 Tax Convention with the United Kingdom of Great Britain and Northern Ireland, 95th Cong., 1st Sess. (1977) (as published in Message from President submitting Second Protocol). Article 9, ¶ 4, of the treaty, which is currently pending before the Senate, would prohibit the combination of the income of any enterprise doing business in the United States with the income of related enterprises located in the United Kingdom.

This contention was not presented to the court below and in any event lacks substance. The existence of the Compact simply has no bearing on an individual State's ability to utilize the unitary business method in determining the income of a particular multinational taxpayer. *Bass, Ratcliff & Gretton, Ltd.* v. *State Tax Comm'n,* 266 U. S. 271 (1924). The Commission, as auditing agent, adopts the method only at the behest of a State requesting an audit. To the extent that its use contravenes any foreign policy of the United States, the facial validity of the Compact is not implicated.

## C

Appellants' final Compact Clause argument charges that the Compact impairs the sovereign rights of nonmember States. Appellants declare, without explanation, that if the use of the unitary business and combination methods continues to spread among the Western States, unfairness in taxation—presumably the risks of multiple taxation—will be avoidable only through the efforts of some coordinating body. Appellants cite the belief of the Commission's Executive Director that the Commission represents the only available vehicle for effective coordination,[30] and conclude that the Compact exerts undue pressure to join upon nonmember States in violation of their "sovereign right" to refuse.

We find no support for this conclusion. It has not been shown that any unfair taxation of multistate business resulting from the disparate use of combination and other methods will redound to the benefit of any particular group of States or to the harm of others. Even if the existence of such a situation were demonstrated, it could not be ascribed to the existence of the Compact. Each member State is free to adopt the auditing procedures it thinks best, just as it could if the Compact

[30] Corrigan, Interstate Corporate Income Taxation—Recent Revolutions and a Modern Response, 29 Vand. L. Rev. 423, 441–442 (1976).

did not exist. Risks of unfairness and double taxation, then, are independent of the Compact.

Moreover, it is not explained how any economic pressure that does exist is an affront to the sovereignty of nonmember States. Any time a State adopts a fiscal or administrative policy that affects the programs of a sister State, pressure to modify those programs may result. Unless that pressure transgresses the bounds of the Commerce Clause or the Privileges and Immunities Clause of Art. IV, § 2, see, *e. g., Austin* v. *New Hampshire,* 420 U. S. 656 (1975), it is not clear how our federal structure is implicated. Appellants do not argue that an individual State's decision to apportion nonbusiness income—or to define business income broadly, as the regulations of the Commission actually do—touches upon constitutional strictures. This being so, we are not persuaded that the same decision becomes a threat to the sovereignty of other States if a member State makes this decision upon the Commission's recommendation.

IV

Appellants further challenge, on relatively narrow grounds, the validity of the Multistate Tax Compact under the Commerce Clause and the Fourteenth Amendment.[31] They allege that the Commission has abused its powers by conducting a campaign of harassment against members of the plaintiff class. Specifically, they claim that the Commission induced eight States to issue burdensome requests for production of documents and to deviate from the provisions of state law by issuing arbitrary assessments against taxpayers who refuse to comply with these harassing production orders.

These allegations do not establish that the Compact is in violation either of the Commerce Clause or the Fourteenth Amendment. We observe first that this contention was not

---

[31] Appellants do not specify in their brief which Clause of the Fourteenth Amendment is violated. Our conclusion makes it unnecessary to consider each one.

presented to the court below. The only evidence of record relating to the allegations are statements in the affidavit of appellants' counsel and an ambiguous excerpt from a letter of the Commission to the Director of Taxation of the State of Hawaii, quoted therein. App. 51–53. On this fragile basis, we hardly would be justified in making an initial finding of fact that appellees engaged in the campaign sketched in the affidavit.

Even if appellants' factual allegations were supported by the record, they would be irrelevant to the facial validity of the Compact. As we have noted above, it is only the individual State, not the Commission, that has the power to issue an assessment—whether arbitrary or not. If the assessment violates state law, we must assume that state remedies are available.[32] E. g., Colgate-Palmolive Co. v. Dorgan, 225 N. W. 2d 278 (N. D. 1974).

## V

We conclude that appellants' constitutional challenge to the Multistate Tax Compact fails.[33] We affirm the judgment of the District Court.

*Affirmed.*

MR. JUSTICE WHITE, with whom MR. JUSTICE BLACKMUN joins, dissenting.

The majority opinion appears to concede, as I think it should, that the Compact Clause reaches interstate agree-

---

[32] Appellants conceded this point in the hearing before the three-judge court. Tr. of Hearing, Feb. 3, 1976, pp. 16–18. Cf. State Tax Comm'n v. Union Carbide Corp., 386 F. Supp. 250 (Idaho 1974).

[33] The dissent appears to confuse potential impact on "federal interests" with threats to "federal supremacy." It dwells at some length on the unsuccessful efforts to obtain express congressional approval of this Compact, relying on the introduction of bills that never reached the floor of either House. This history of congressional inaction is viewed as "demonstrat[ing] . . . a federal interest in the rules for apportioning multistate and

ments presenting even *potential* encroachments on federal supremacy. In applying its Compact Clause theory to the circumstances of the Multistate Tax Compact, however, the majority is not true to this view. For if the Compact Clause has any independent protective force at all, it must require the consent of Congress to an interstate scheme of such complexity and detail as this. The majority states it will

---

multinational income," and as showing "a *potential* impact on federal concerns." *Post,* at 488, 489. That there is a federal interest no one denies.

The dissent's focus on the existence of federal concerns misreads *Virginia* v. *Tennessee* and *New Hampshire* v. *Maine*. The relevant inquiry under those decisions is whether a compact tends to increase the political power of the States in a way that "may encroach upon or interfere with the just supremacy of the United States." *Virginia* v. *Tennessee,* 148 U. S., at 519. Absent a threat of encroachment or interference through enhanced state power, the existence of a federal interest is irrelevant. Indeed, every state cooperative action touching interstate or foreign commerce implicates some federal interest. Were that the test under the Compact Clause, virtually all interstate agreements and reciprocal legislation would require congressional approval.

In this case, the Multistate Tax Compact is concerned with a number of state activities that affect interstate and foreign commerce. But as we have indicated at some length in this opinion, the terms of the Compact do not enhance the power of the member States to affect federal supremacy in those areas.

The dissent appears to argue that the political influence of the member States is enhanced by this Compact, making it more difficult—in terms of the political *process*—to enact pre-emptive legislation. We may assume that there is strength in numbers and organization. But enhanced capacity to lobby within the federal legislative process falls far short of threatened "encroach[ment] upon or interfer[ence] with the just supremacy of the United States." Federal power in the relevant areas remains plenary; no action authorized by the Constitution is "foreclosed," see *post,* at 491, to the Federal Government acting through Congress or the treatymaking power.

The dissent also offers several aspects of the Compact that are thought to confer "synergistic" powers upon the member States. *Post,* at 491–493. We perceive no threat to federal supremacy in any of those provisions. See, *e. g., Virginia* v. *Tennessee, supra,* at 520.

watch for the mere *potential* of harm to federal interests, but then approves the Compact here for lack of *actual* proved harm.

I

The Constitution incorporates many restrictions on the powers of individual States. Some of these are explicit, some are inferred from positive delegations of power to the Federal Government. In the latter category falls the federal authority over interstate commerce.[1] The individual States have long been permitted to legislate, in a nondiscriminatory manner, over matters affecting interstate commerce, where Congress has not exerted its authority, and where the federal interest does not require a uniform rule. *Cooley* v. *Board of Wardens,* 12 How. 299 (1852); *Southern Pacific Co.* v. *Arizona ex rel. Sullivan,* 325 U. S. 761 (1945).

It is not denied by any party to this case that the apportionment of revenues, sales, and income of multistate and multinational corporations for taxation purposes is an area over which the Congress could exert authority, ousting the efforts of any States in the field. To date, however, the Federal Government has taken only limited steps in this context.[2] No federal legislation has been enacted, nor tax treaties ratified, that would interfere with any State's efforts to apply uniform apportionment rules, unitary business concepts, or single multistate audits of corporations. Hence, leaving to one side appellants' contentions that these matters inherently require uniform federal treatment, there is no

---

[1] "The Congress shall have Power . . . To regulate Commerce with foreign Nations, and among the several States . . . ." U. S. Const., Art. I, § 8.

[2] Title 15 U. S. C. §§ 381–384, passed in 1959 as Pub. L. No. 86–272, 73 Stat. 555, limits the jurisdictional bases open to States whereby taxation authority may be exerted. More comprehensive federal regulation of this area has often been proposed; see *ante,* at 456 n. 4.

obstacle in the Commerce Clause to such action by an individual State.

The Compact Clause, however, is directed to joint action by more than one State. If its only purpose in the present context were to require the consent of Congress to agreements between States that would otherwise violate the Commerce Clause, it would have no independent meaning. The Clause must mean that some actions which would be permissible for individual States to undertake are not permissible for a group of States to *agree* to undertake.

There is much history from the Articles of Confederation to support that conclusion.[3] In framing the Constitution the

---

[3] Under the Articles of Confederation, dealings of the States with foreign governments and among themselves were separately treated. Article VI of the Articles of Confederation provided:

"§ 1. No State, without the Consent of the United States, in Congress assembled, shall send any embassy to, or receive any embassy from, or enter into any confe[r]ence, agreement, alliance, or treaty, with any king, prince or State . . . ."

Thereafter, in that same Article, it was provided:

"§ 2. No two or more States shall enter into any treaty, confederation, or alliance whatever, between them, without the consent of the United States, in Congress assembled, specifying accurately the purposes for which the same is to be entered into, and how long it shall continue."

There was thus no requirement that mere "agreements" between States be subjected to the approval of Congress. That the framers of the Articles recognized a distinction between treaties, alliances, and confederations on the one hand and agreements on the other is demonstrated by the differing language in the two paragraphs above quoted, taken from the same Article.

David Engdahl, in Characterization of Interstate Arrangements: When is a Compact not a Compact?, 64 Mich. L. Rev. 63, 81 (1965), has suggested a perceptive rationale for this difference in treatment. Article IX, § 2, of the Articles of Confederation provided:

"The United States, in Congress assembled, shall also be the last resort on appeal in all disputes and .differences now subsisting, or that hereafter may arise between two or more States concerning boundary, jurisdiction, or any other cause whatever . . . ."

And it specified an elaborate system by which the Congress would

new Republic was at pains to correct the divisive factors of the Government under the Articles; and among the most important of these were "compacts witht. the consent of Congs. as between Pena. and N. Jersey, and between Virga. & Maryd." James Madison, "Preface to Debates in the Convention of 1787," 3 M. Farrand, Records of the Federal Convention of 1787, p. 548 (1937). A compact between two States necessarily achieved some object unattainable, or attainable less conveniently, by separate States acting alone. Such effects were jealously guarded against, lest "the Fedl authy [be] violated." *Ibid.* It was the Federal Government's province to oversee conduct of a greater effect than a single State could accomplish, to protect both its own prerogative and that of the excluded States.[4]

Compacts and agreements between States were put in a separate constitutional category, and purposefully so. Nor is the form used by the agreeing States important; as the majority correctly observes:

"Agreements effected through reciprocal legislation may present opportunities for enhancement of state power

---

constitute a court for the resolution of interstate disputes. Hence, if there were a disagreement over a compact that had been reached between two or more States, it could be adjudicated amicably before the Congress without risk of disrupting the Union. Treaties with foreign states, on the other hand, were much more dangerous and could embroil a State in serious obligations and even war. Of almost the same level of seriousness were alliances between the States, of potential long duration and obliging one State to treat two sister States in different fashion. For these reasons, prior approval by the Congress was required.

As Madison's commentary quoted in the text indicates, there was dissatisfaction with the way in which the Articles of Confederation provided for interstate compacts. The Constitution adopted an absolute prohibition against treaties, alliances, or confederations by the States; and imposed the requirement of congressional approval for "any Agreement or Compact with another State, or with a foreign Power." U. S. Const., Art. I, § 10.

[4] See *infra,* at 493–496.

at the expense of the federal supremacy similar to the threats inherent in a more formalized 'compact.' . . . The Clause reaches both 'agreements' and 'compacts,' the formal as well as the informal. The relevant inquiry must be one of impact on our federal structure." *Ante,* at 470–471 (footnotes omitted).

"Appellants further urge that the pertinent inquiry is one of potential, rather than actual, impact upon federal supremacy. We agree." *Ante,* at 472.

This is an apt recognition of the important distinction between the Compact Clause and the Commerce Clause. States may legislate in interstate commerce until an *actual* impact upon federal supremacy occurs. For individual States, the harm of *potential* impact is insufficiently upsetting to require prior congressional approval. For States acting in concert, however, whether through informal agreement, reciprocal legislation, or formal compact, "potential . . . impact upon federal supremacy" is enough to invoke the requirement of congressional approval.[5]

To this point, my views do not diverge from those of the majority as I understand them. But we do differ markedly in the application of those views to the Multistate Tax Compact.

## II

Congressional consent to an interstate compact may be expressed in several ways. In the leading case of *Virginia* v. *Tennessee,* 148 U. S. 503 (1893), congressional consent to a compact setting a boundary was inferred from years of acqui-

---

[5] The frequent circumstance of *potential* impact would make that standard unworkable in the Commerce Clause context since the result is pre-emption of state effort; but where the result is merely the requirement that Congress be consulted about the State's effort, as is the case with the Compact Clause, the application of that standard is not nearly so obstructive.

escence to that line by the Congress in delimiting federal judicial and electoral districts. *Id.*, at 522. Congressional consent may also be given in advance of the adoption of any specific compacts, by general consent resolutions, as was the case for the highway safety compacts, 72 Stat. 635, and the Crime Control Compact Consent Act of 1934, ch. 406, 48 Stat. 909.

Congress does not pass upon a submitted compact in the manner of a court of law deciding a question of constitutionality. Rather, the requirement that Congress approve a compact is to obtain its political judgment: [6] Is the agreement likely to interfere with federal activity in the area, is it likely to disadvantage other States to an important extent, is it a matter that would better be left untouched by state and federal regulation? [7] It comports with the purpose of seeking the political consent Congress affords that such consent may be expressed in ways as informal as tacit recognition [8] or prior approval, that Congress be permitted to attach condi-

---

[6] See n. 3, *supra.*

[7] The pioneer article in the compact literature, Frankfurter & Landis, The Compact Clause of the Constitution—A Study in Interstate Adjustments, 34 Yale L. J. 685 (1925), recognized the preferability of compacts to litigation in light of the political factors that could be balanced in the process of submitting and approving a compact. See *id.*, at 696, 706–707. This Court has also observed the peculiar amenability of some problems to settlement by compact rather than litigation. See *Colorado* v. *Kansas,* 320 U. S. 383, 392 (1943). See also F. Zimmermann & M. Wendell, The Interstate Compact Since 1925, pp. 102–103 (1951).

[8] A statute-of-limitations type of approach to the necessary duration of congressional silence before consent may be inferred has been suggested by one commentator. Note, The Constitutionality of the Multistate Tax Compact, 29 Vand. L. Rev. 453, 460 (1976). The National Association of Attorneys General has also declared its support for the use of informal procedures. F. Zimmermann & M. Wendell, The Law and Use of Interstate Compacts 25 (1961).

tions upon its consent,[9] and that congressional approval be a continuing requirement.[10]

In the present case, it would not be possible to infer approval from the congressional reaction to the Multistate Tax Compact. Indeed, the history of the Congress and the Compact is a chronicle of jealous attempts of one to close out the efforts of the other.[11]

On the congressional side of this long-lived battle, bills to approve the Compact have been introduced 12 separate times,[12] but all have faltered before arriving at a vote. Congress took the first step in the field of interstate tax apportionment with Pub. L. No. 86-272, 73 Stat. 555, passed the same year that this Court's opinion in *Northwestern States Portland Cement Co.* v. *Minnesota,* 358 U. S. 450 (1959),

---

[9] In *West Virginia ex rel. Dyer* v. *Sims,* 341 U. S. 22, 27 (1951), this Court commented favorably on the provisions of the Compact involved which allowed continuing participation by the Federal Government through the President's power to designate members of the supervisory commission. The Port of New York Authority Compacts of 1921 and 1922 were among the first to provide for direct continuing supervisory authority by Congress. See Celler, Congress, Compacts, and Interstate Authorities, 26 Law & Contemp. Prob. 682, 688 (1961) (hereinafter Celler). It has been suggested that the imposition of conditions and the continuing nature of Congress' supervision are perceived as drawbacks by compacting States, and have led to a hesitancy to submit interstate agreements to Congress. See Note, *supra,* n. 8, at 461.

[10] This Court has held that Congress must possess the continuing power to reconsider terms approved in compacts, lest "[C]ongress and two States . . . possess the power to modify and alter the [C]onstitution itself." *Pennsylvania* v. *Wheeling & Belmont Bridge Co.,* 18 How. 421, 433 (1856). See also Celler 685, and authorities cited therein.

[11] An excellent summary of the several battles in this war is recounted in Hellerstein, State Taxation Under the Commerce Clause: An Historical Perspective, 29 Vand. L. Rev. 335, 339–342 (1976). See also Sharpe, State Taxation of Interstate Businesses and the Multistate Tax Compact: The Search for a Delicate Uniformity, 11 Colum. J. L. & Soc. Prob. 231, 240–244 (1975) (hereinafter Sharpe).

[12] See *ante,* at 458 n. 8.

approved state taxation of reasonably identified multistate corporate income. A special subcommittee (the Willis Committee) was established which reported five years later with specific recommendations for federal statutory solution to the interstate allocation problem. In the Multistate Tax Commission's own words:

> "The origin and history of the Multistate Tax Compact are intimately related and bound up with the history of the states' struggle to save their fiscal and political independence from encroachments of certain federal legislation introduced in '[C]ongress during the past three years. These were the Interstate Taxation Acts, better known as the Willis Bills." [13]

A special meeting of the National Association of Tax Administrators was called in January 1966; that gathering was the genesis of the Multistate Tax Compact. Over the course of 11 years, numerous bills have been introduced in the Congress as successors to the original Willis Bills, but none has ever become law.[14]

For its part, the Multistate Tax Commission has made no attempt to disguise its purpose. In its First Annual Report, the Commission spoke proudly of "bottling up the Willis Bill [alternative federal legislation] for an extended period," but warned that "it cannot be said that the threat of coercive, restrictive federal legislation is gone." 1 Multistate Tax Commission Ann. Rep. 10 (1968). In the most recent annual report, the tone has not changed. The Commission lists as one of its "major goals" the desire to "guard against restrictive federal legislation and other federal action which impinges upon the ability of state tax administrators to carry out the laws of their states effectively." 9 Multistate Tax Commission Ann. Rep. 1 (1976). The same report pledged continued

---

[13] 1 Multistate Tax Commission Ann. Rep. 1 (1968).

[14] See *ante*, at 456 n. 4.

opposition to specific bills introduced in Congress restricting the States' utilization of the unitary-business concept and providing alternatives to the Compact's recommended method of apportioning multistate corporate earnings to the various States.[15]   Even more importantly, the Commission denounced the tax treaty already signed with Great Britain (though not yet ratified),[16] for its prohibition of the unitary-business concept, the practice whereby a State combines for tax purposes the incomes from several related companies belonging to a single parent, even when the business carried on in a particular State is conducted by only one of the related companies.   The President has negotiated this treaty in the diplomatic interest of the United States; but acting together through their joint agency, the Multistate Tax Commission, the Compact States are opposing its ratification.   Of course, the Compact States have every right, in their own interest, to petition the branches of the Federal Government.   Still, it cannot be disputed that the action of over 20 States, speaking through a single, established authority, carries an influence far stronger than would 20 separate voices.

A hostile stalemate characterizes the present position of the parties: the Multistate Tax Compact States opposing the Federal Congress and, since the proposed new tax treaty, the Federal Executive as well.   No one could view this history and conclude that the Congress has acquiesced in the Multistate Tax Compact.

But more is demonstrated by this long dispute underlying the present case: Not only has Congress failed to acquiesce in the Multistate Tax Compact, but both Congress and the Executive have clearly demonstrated that there is a federal interest in the rules for apportioning multistate and multi-national income.   The Executive cannot constitutionally express his federal sovereign interest in the matter any more

---

[15] See also 7 Multistate Tax Commission Ann. Rep. 3 (1974).

[16] See *ante,* at 476 n. 29.

unambiguously. He has negotiated a treaty with a foreign power and submitted that treaty to the Senate. As for the Congress, its federal sovereign interest in the topic was early established in Pub. L. No. 86–272. While the following years have produced no new legislation, the activity over the Willis Report, the Willis Bills, the successor bills, and the dozen shelvings of compact ratification bills establish at the very least that the Congress believes a federal interest is involved.[17] That a *potential* impact on federal concerns is at stake is indisputable.

It might be argued that Congress could more clearly have expressed its federal interest by passing a statute pre-empting the field, possibly in the form of an alternative apportionment formula. To hold Congress to the necessity of such action, however, accords no force to the Compact Clause independent of the Commerce Clause, as explained above. If the way to show a *"potential* federal interest" requires an exercise of the actual federal commerce power, then the purposes of the Compact Clause, and the Framers' deep-seated and special fear of agreements between States, would be accorded absolutely no respect.

## III

*Virginia* v. *Tennessee* [18] quite clearly holds that not all agreements and compacts must be submitted to the Congress. The majority's phraseology of the test as "potential impact upon federal supremacy" incorporates the *Virginia* v. *Tennessee* standard. Nor do I disagree that many interstate agreements are legally effective without congressional consent. "Potential impact upon federal supremacy" requires some demonstration of a federal interest in the matter under consideration, and a threat to that interest. In very few cases,

---

[17] For contrasting examples, where Congress perceived no federal interest, see Zimmermann & Wendell, *supra,* n. 8, at 21.

[18] See also *Wharton* v. *Wise,* 153 U. S. 155 (1894), applying the *Virginia* v. *Tennessee* dicta.

short of a direct conflict, will the record of congressional and executive action demonstrate as clearly as the record in the present case that the Federal Government considers itself to have a valid interest in the subject matter. Examples of compacts over which no federal concern was inferable have already been suggested.[19]

It seems to me, however, that even if a realistic potential impact on federal supremacy failed to materialize at one historic moment, that should not mean that an interstate compact or agreement is forever immune from congressional disapproval on an absolute or conditional basis. Yet the majority's approach appears to be that, because the instant agreement is, in the majority's view, initially without the Clause, it will *never* require congressional approval. The majority would approve this Compact without congressional ratification purely on the basis of its form: that no power is conferred upon the Multistate Tax Commission that could not be independently exercised by a member State. Such a view pretermits the possibility of requiring congressional approval in the future should circumstances later present even more clearly a potential federal interest, so long as the form of the Compact has not changed. That consequence fails to provide the ongoing congressional oversight that is part of the Compact Clause's protections.[20]

## IV

For appellants' many suggestions of extraordinary authority wielded by the Multistate Tax Commission, the majority has but one repeated answer: that each member State is free

---

[19] See *ante*, at 471–472, n. 24 (discussion of Interstate Compact to Conserve Oil and Gas).

[20] See n. 10, *supra*. Frankfurter and Landis found great value in interstate compacts because of their "[c]ontinuous and creative administration." See Frankfurter & Landis, *supra*, n. 7, at 707. By excluding Congress from the administration of the Multistate Tax Compact, the majority opinion restricts this facet of the Compact's attractiveness.

to adopt the procedures in question just as it could as if the Compact did not exist.

This cannot be an adequate answer even for the majority, which holds that "[a]greements effected through reciprocal legislation may present opportunities for enhancement of state power at the expense of the federal supremacy similar to the threats inherent in a more formalized 'compact.'" *Ante,* at 470 (footnote omitted). Reciprocal legislation is adopted by each State independently, yet derives its force from the knowledge that other States are acting in identical fashion. In recognizing Compact Clause concerns even in reciprocal legislation, the majority correctly lays the premise that the absence of an autonomous authority would not be controlling.

So here, that the Compact States act in concerted fashion to foreclose federal law and treaties on apportionment of income, multistate audits, and unitary-business concepts[21] tells us at the least that a potential impact on federal supremacy exists. No realistic view of that impact could maintain that it is no greater than if individual States, acting purely spontaneously and without concert, had taken the same steps. It is pure fantasy to suggest that 21 States could conceivably have arrived independently at identical regulations for apportioning income, reciprocal subpoena powers, and identical interstate audits of multinational corporations, in the absence of some agreement among them.

Further, it is not clear upon reading the majority's opinion that appellants' suggestions of actual synergistic powers in the Multistate Tax Commission have been adequately answered.

---

[21] For a detailed analysis of the complex taxation issues underlying each of these terms, see Carlson, State Taxation of Corporate Income from Foreign Sources, Department of Treasury Tax Policy Research Study Number Three, Essays in International Taxation: 1976, pp. 231, 235–252. For a thorough treatment of the income-allocation problem in the multinational setting, see Note, Multinational Corporations and Income Allocation Under Section 482 of the Internal Revenue Code, 89 Harv. L. Rev. 1202 (1976).

The Commission does have some life of its own. Under Art. VIII, providing for interstate audits, the Commission is given authority to offer to conduct audits even if no State has made a request.

> "If the Commission, on the basis of its experience, has reason to believe that an audit of a particular taxpayer, either at a particular time or on a particular schedule, would be of interest to a number of party States or their subdivisions, it may offer to make the audit or audits, the offer to be contingent on sufficient participation therein as determined by the Commission." Multistate Tax Compact, Art. VIII, § 5.

If not for the Commission's acting on its own, in the absence of a suggestion from any State, the audit would not come about, even if the States subsequently approve. That implies some effects can be achieved beyond what the individual States themselves would have achieved, since, by hypothesis, no State would have proposed the audit on its own.

Other troubling provisions are Art. III, § 1, requiring that all member States *must* allow taxpayers to apportion their income in accord with Art. IV (the substance of which is similar to the Uniform Division of Income for Tax Purposes Act); and Art. III, § 2, requiring that all member States *must* offer a short-form option for small-business income tax.[22] If Compact States have no choice in the matter, these sections unquestionably go beyond the mere advisory role in which the majority would cast the Multistate Commission.

On its face, the Compact also provides in Art. IX for compulsory arbitration of allocation disputes among the member States at the option of any taxpayer electing to apportion his

---

[22] There is some question as to whether this Article is as mandatory as its language suggests. Several States in the Compact do not provide the option, and several others have not adopted the requisite rates to accompany the option. See Sharpe 245 n. 55. However, most of the member States have complied.

income in accord with Art. IV. Although Art. IX is not now operative (it requires passage of a regulation by the Commission to revive the arbitration mechanism), it was in effect for two and a half years. This provision binds the member States' participation, even against their will in any particular case. In two final respects, the Compact also differs significantly from reciprocal legislation. The subpoena power which the Compact makes possible (auditors can obtain subpoenas in any one of the States which have adopted Art. VIII of the Compact) is far different from what would be accomplished through reciprocal laws, in that it places an unusual "all-or-nothing" pressure on the non-Compact States. The usual form of reciprocal law is a statute passed by State Y, saying that any other State which accords Y access to its courts for the enforcement of tax obligations likewise will have access to the courts of Y. This Compact says that an outsider State will obtain reciprocal subpoena powers only as part of a package of Art. VIII Compact States—its own courts must be opened to all these States, and in return it will obtain Compact-wide access for judicial process needed in its own tax enforcement.

Lastly, the very creation of the Compact sets it apart from separate state action. The Compact did not become effective in *any* of the ratifying States until at least seven States had adopted it. Thus, unlike reciprocal legislation, the Compact provided a means by which a State could *assure* itself that a certain number of other States would go along before committing itself to an apportionment formula.

## V

One aspect of the *Virginia* v. *Tennessee* test for congressional approval of interstate compacts requires specific emphasis. The *Virginia* v. *Tennessee* opinion speaks of whether a combination tends "to the increase of political power in the States, which may encroach upon or interfere

with the just supremacy of the United States," 148 U. S., at 519, and later, whether a compact or agreement would "encroach or not upon the full and free exercise of Federal authority." *Id.,* at 520.

The majority properly notes that any agreement among the States will increase their power, and focuses on the critical question of whether such an increase will enhance "state power *quoad* the National Government." *Ante,* at 473. A proper understanding of what would encroach upon federal authority, however, must also incorporate encroachments on the authority and power of non-Compact States.

In *Rhode Island* v. *Massachusetts,* 12 Pet. 657, 726 (1838), this Court held that the purpose of requiring the submission to Congress of a compact (in that case, regarding a boundary) between two States was "to guard against the derangement of their federal relations with the other states of the Union, and the federal government; which might be injuriously affected, if the contracting states might act upon their boundaries at their pleasure." See also *Florida* v. *Georgia,* 17 How. 478, 494 (1855). There is no want of authority for the conclusion that encroachments upon non-compact States are as seriously to be guarded against as encroachments upon the federal authority,[23]

---

[23] See, *e. g., United States* v. *Tobin,* 195 F. Supp. 588, 606 (DC 1961); Tribe, Intergovernmental Immunities in Litigation, Taxation, and Regulation: Separation of Powers Issues in Controversies About Federalism, 89 Harv. L. Rev. 682, 712 (1976); Sharpe 265–272 (specifically observing state complaints about the Multistate Tax Compact); Zimmermann & Wendell, *supra,* n. 8, at 23; Celler 684 (purpose of Compact Clause " 'to prevent undue injury to the interests of noncompacting states,' " quoting *United States* v. *Tobin, supra*); and Frankfurter & Landis, *supra,* n. 7, at 694–695. The Frankfurter and Landis treatment is perhaps the clearest expression of how the protection of federal and noncompact state interests blend in the rationale for the Compact Clause:

"But the Constitution plainly had two very practical objectives in view in conditioning agreement by States upon consent of Congress. For only Congress is the appropriate organ for determining what arrangements between States might fall within the prohibited class of 'Treaty, Alliance,

nor is that surprising in view of the Federal Government's pre-eminent purpose to protect the rights of one State against another. If the effect of a compact were to put non-compact States at a serious disadvantage, the federal interest would thereby be affected as well.

The majority appears to recognize that allegations of harmful impact on other States is a cognizable challenge to a compact. See *ante,* at 477–478, 462–463, n. 12. The response the majority opinion provides is by now a familiar one: "Each member State is free to adopt the auditing procedures it thinks best, just as it could if the Compact did not exist." *Ante,* at 477–478. The criticism of this reasoning offered above, in the context of encroachment on federal power, is applicable here as well. Judging by effect, not form, it is obvious that non-Compact States can be placed at a competitive disadvantage by the Multistate Tax Compact.

One example is in the attraction of multistate corporations to locate within a certain State's borders. Before the Multistate Tax Compact, "nonbusiness" dividend income was most commonly allocated to the State where a corporation was domiciled.[24] Under the Compact's "advisory" regulations, this type of income is apportioned among the several States where the company conducts its business. Hence, a non-Compact State will run the risk of taxing a domiciliary multistate corporation on more than 100% of its nonbusiness income, unless, of course, the State agrees to follow the rule of the Compact. Another way to view the impact on a non-member State is that if it wished to attract a multistate

---

or Confederation,' and what arrangements come within the permissive class of 'Agreement or Compact.' But even the permissive agreements may affect the interests of States other than those parties to the agreement: the national, and not merely a regional, interest may be involved. Therefore, Congress must exercise national supervision through its power to grant or withhold consent, or to grant it under appropriate conditions." *Ibid.*

[24] See Sharpe 269.

corporation to become a domiciliary, it might offer not to tax nonbusiness income. But with such income being apportioned by several other States anyway, the lure of the domicile State's exemption is effectively dissipated.

None of these results is necessarily "bad." The only conclusion urged here is that the effect on non-Compact States be recognized as sufficiently serious that Congress should be consulted. As the constitutional arbiter of political differences between States, the Congress is the proper body to evaluate the extent of harm being imposed on non-Compact States, and to impose ameliorative restrictions as might be necessary.

The Compact Clause is an important, intended safeguard within our constitutional structure. It is functionally a conciliatory rather than a prohibitive clause. All it requires is that Congress review interstate agreements that are capable of affecting federal or other States' rights. In the Court's decision today, a highly complex multistate compact, detailed in structure and pervasive in its effect on the important area of interstate and international business taxation, has been legitimized without the consent of Congress. If the Multistate Tax Compact is not a compact within the meaning of Art. I, § 10, then I fear there is very little life remaining in that section of our Constitution.

I respectfully dissent.